COMMONWEALTH *vs.* JAMES L. COFIELD & another[1]
(and twenty-two companion cases).

Suffolk.    November 13, 1973. — January 15, 1974.

Present: HALE, C.J., GRANT, & ARMSTRONG, JJ.

*Practice, Criminal,* Examination of jurors, Fair trial.   *Jury and Jurors. Constitutional Law,* Due process of law.   *Identification.*

In a prosecution of black defendants for armed robbery of white boys and girls and rape of the girls, there was no error in a refusal of the trial judge to ask prospective jurors certain specific questions concerning

---

[1] George Dukes.

Commonwealth *v.* Cofield.

racial bias in addition to the questions provided for in G. L. c. 234, § 28, where he had given a large group of prospective jurors general instructions at length on the subject of racial bias and thereby had focussed their attention on that subject. [663-665]

In a prosecution of black defendants for armed robbery of four white boys and girls and rape of the girls, there was, in view of warranted findings by the judge, no error in refusing to suppress identifications of a defendant by the girls from photographs and at a lineup and in-court identifications by the girls notwithstanding that similar identifications by the boys were suppressed, or error in the photographic identification procedure as to the girls in that the four victims were allowed to examine photographs while they were all together and to confer among themselves about the photographs. [665-667]

INDICTMENTS found and returned in the Superior Court on November 10, 1971.

The cases were tried before *Paquet,* J.

*Harvey A. Silverglate* for the defendant Cofield.

*William A. Doherty,* Assistant District Attorney, for the Commonwealth.

*Edward F. Haber,* for the defendant Dukes, submitted a brief.

HALE, C.J.    After a joint trial held subject to the provisions of G. L. c. 278, §§ 33A-33G, both defendants were found guilty on four indictments charging assault with a dangerous weapon, on four indictments charging armed robbery, and on three indictments charging kidnapping. Additionally, Dukes was found guilty on two indictments charging rape and Cofield on one.

The defendant Cofield has briefed and argued two assignments of error: (1) that the judge improperly refused to ask prospective jurors certain questions on voir dire designed to elicit possible racial bias in addition to the questions provided for by G. L. c. 234, § 28;[2] and (2) that he was deprived of due process of law because the photograph-

---

[2] "Upon motion of either party, the court shall, or the parties or their attorneys may under the direction of the court, examine on oath a person who is called as a juror therein, to learn whether he is related to either party or has any interest in the case, or has expressed or formed an opinion, or is sensible of any bias or prejudice, therein; and the objecting party may introduce other competent evidence in support of the objection. If the court finds that the juror does not stand indifferent in the case, another shall be called in his stead."

ic identification procedure which resulted in the selection of his photograph by the four victims "was so impermissibly suggestive . . . [that it gave] rise to a very substantial likelihood of irreparable misidentification." The defendant Dukes is here on a single assignment of error which is substantially the same as Cofield's first assignment of error, set out above. There was no error.

It appears from the evidence that at about 11:45 P.M. on August 14, 1971, four white teenagers, Lynne, Mary, Paul and David, who had been bowling, were walking through a baseball field in the Fens area of Boston on their way to Mary's home in the Mission Hill section of Roxbury. When they reached the middle of the field they were accosted by a group of seven or eight black youths, at least four of whom brandished knives. During this encounter, which lasted ten minutes, the four victims were robbed of money and jewelry, after which the robbers left. The four then started to walk toward Park Drive but were soon confronted again by one of the youths, later identified as the defendant Cofield. He said that he and his friends needed cash and not the jewelry. The four victims followed Cofield to a wall at the side of the park where the other youths were waiting. There they were told by the defendant Dukes, who appeared to be the leader of the group, that if they could come up with twenty-five dollars in cash he would return all of their jewelry. Dukes told Paul to go home and get the money and that the other three would be held as hostages. He also told Paul that the hostages would be killed if the police were called or if Paul did not return "within a certain amount of time." Paul left and was followed by one of the youths.

Dukes then forced Lynne into some bushes about twenty yards from the group and there raped her. After Dukes left with Lynne, Cofield talked with Mary for about ten minutes and then ordered her into the bushes. Brandishing a knife, he gave her the alternative of removing her clothing or being killed. While she was undressing, Dukes appeared. Dukes then proceeded to rape Mary while Cofield held a knife to her throat. Cofield then raped her. A third youth

Commonwealth *v*. Cofield.

was prevented from performing a similar act by the arrival of the police. Upon the arrival of the police all the youths fled. A quick search of the area by the police met with no success. The victims were then taken to a hospital.

1. Prior to trial, requests for voir dire questions were filed by the defendants.[3] The trial judge refused to give those requests but said that he would instruct the venire, from which the jury would be selected, on the fundamental rules of law and would refer to the matters raised in the suggested questions concerning racial prejudice.

Sixty prospective jurors were called to the court room from the regular jury pool and were given general instructions on the law, including the need for jurors to be free of bias and prejudice in their deliberations.[4] No exception was taken to any of those remarks, nor was the judge requested

---

[3] The questions requested were:

"3. Will you be influenced in any way, either pro or con, by the race of James Cofield?

"4. Would you be able to give a black man accused of rape with white women the same benefit of the doubt that you would give to a white defendant accused of rape with black women?

"10. Do you live in an integrated neighborhood?

"11. If Negroes moved into your neighborhood, would you be more afraid of crime than you are now?

"12. Would you be able to give a black man accused of raping a white woman the same benefit of doubt that you would give to a defendant accused of raping a woman of his own race?"

[4] After informing the prospective jurors that the defendants were black and that the alleged victims were white, the judge proceeded to instruct the prospective jurors, in part, as follows: "Each [defendant] is in court on an equal basis under the law. Each is entitled to a just and a true verdict, no more and no less. In order that the jury return a true verdict, you cannot permit any factors of bias or prejudice . . . to be determinative in any degree in the ultimate decision you reach. . . . The fact that the defendants are black and that the persons who are the so-called victims of the particular incident are white, you have no right to evaluate the facts on the basis that the defendants are black and the victims are white. You have no right to evaluate the facts on the fact that the defendants are alleged to have raped two white girls. You cannot permit yourselves, because of the allegations, to infer or conclude that merely because the defendants are black and the victims are white . . . that there is a different rule of law that applies. It is the same. Black or white, red or yellow, persons of those nationalities are all human beings and in our courts and in this court they are all entitled to equal justice . . . .. Whether it is a fact that the defendants are black and the victims are white, the same rule of evidence and the same rule of law applies and you do not infer unfavorably because one is black and the other is white, or vice versa. . . . So this purpose of mine is to call to your attention the importance of being impartial and keep[ing] open minds to the end that as best we human beings can render justice."

to extend or clarify them. Prospective jurors were selected and examined.[5] G. L. c. 234, § 28. No juror expressed an affirmative response to any of those directions, nor did any indicate a desire so to respond. No challenges were exercised, but both defendants "took exceptions to the whole panel on the questions in the voir dire."[6] Those exceptions form the basis for the assignments of error argued by both defendants.

The substance of the defendants' argument is that a black defendant, accused of raping a white woman, falls within the ambit of *Ham* v. *South Carolina,* 409 U. S. 524 (1973), by the very nature of the offense charged. In the *Ham* case the black defendant, well known locally as a civil rights activist, was convicted of possession of marijuana; the United States Supreme Court held that in the circumstances the trial judge was required to inquire specifically into the question of the jurors' possible racial bias. We note that our Supreme Judicial Court has said that the *Ham* rule requiring such inquiry applies only where "special circumstances" can be shown. *Commonwealth* v. *Ross,* 363 Mass. 665 (1973), cert. den. sub nom. *Ross* v. *Massachusetts,* 414 U. S. 1080 (1973). *Commonwealth* v. *Ryles,* 363 Mass. 674 (1973).[7]

Assuming without deciding that the rape of a white woman by a black man constitutes a special circumstance within the meaning of the *Ross* and *Ryles* cases, our opinion is that the trial judge in the case at bar committed no error

---

[5] "If any of you are related to either of the defendants, James L. Cofield of Warren Street in Roxbury, or to the other defendant, George Dukes of Annunciation Road in Roxbury; or if you are related or know of the victims whose names are . . . brother and sister, of . . . or if you know of or are related to the following Boston Police Officers who will be called as witnesses in this case . . . or if you are conscious of any bias. or prejudice about this case; or if you have formed or expressed any opinion about this case; or if you have any interest in this case whatsoever, kindly make it known to the Court at this time."

[6] The quoted portion is from the trial transcript and appears to be the stenographer's summary of exceptions taken at an unrecorded bench conference.

[7] "Special circumstances" suggested in the *Ryles* case include the defendant's reputation "for activities that might subject him to racial animosity" or racial motivation by the police "in seeking the defendant's prosecution and conviction." *Id.* at 676.

in refusing to ask the requested questions. "[T]he trial judge [is] not required to put the question in any particular form, or to ask any particular number of questions on the subject, simply because requested to do so by [the defendant]." *Ham* v. *South Carolina,* 409 U. S. 524, 527 (1973). Thus, in cases where the issue of the prospective jurors' racial prejudice is material, the crucial circumstance is not whether they are asked any particular questions on the subject but whether their attention is sufficiently drawn to the possibility that some of them may harbor such prejudice toward a black defendant. We think the lengthy remarks of the judge on the subject, reproduced in part in footnote 4, served clearly to "focus the attention of prospective jurors on any racial prejudice they might entertain." *Id.* at 527. We cannot see how any of the veniremen in this case could have failed to understand that the statutory questions, propounded shortly after those remarks, clearly encompassed racial bias and required a response from any juror who might hold such bias. The judge's remarks pointedly amplified the importance and delineated the broad scope of the statutory questions. While it might have been preferable for the judge to have made specific inquiry (see *Commonwealth* v. *Ross,* 363 Mass. 665, 673-674 [1973]), we cannot say that he was required to do so, as his prefatory remarks here accomplished the same objective as specific inquiry would have. See *Commonwealth* v. *Rodriquez,* 364 Mass. 87, 92-93 (1973).

2. Cofield filed motions to suppress the photographic, lineup and the in-court identifications of him by the four victims. The judge held an extensive pre-trial hearing which lasted three days and which covered 359 pages of transcript. Cofield's motions were allowed as to the identifications by Paul and David. They were denied as to identifications by Lynne and Mary, and the defendant's exceptions were saved. Those exceptions form the basis of Cofield's additional assignment of error.

The judge made detailed findings of fact, which were amply supported by the evidence. His findings included the facts previously related herein and also that the lighting

at the scene of the first encounter was sufficient to permit the victims to see the faces of the youths without difficulty; that the light came from street lights on nearby Park Drive as well as from a light on a clubhouse at the end of the ball field. He further found that at about 4:30 A.M. on August 15 the victims were taken to the Boston police headquarters, where the officer in charge selected certain drawers from extensive files of police photographs. The four victims divided the drawers equally among them, and each examined about 200 photographs. They were allowed by the officer in charge to remain together and to confer in arriving at an identification. They were instructed to be absolutely positive of any identification made. During the examination of the photographs, Mary picked out a photograph of Cofield from a drawer, showed it to Lynne and asked her, "Does it look like one of them to you?" Lynne responded that it did. Mary then repeated the procedure with Paul and David, who also responded affirmatively. Other photographs were picked out by the victims. As to six of the photographs selected, the victims could not make a positive identification, but they were definite that the photograph of Cofield was that of one of their assailants.

On September 30 a lineup was held which included the defendant Cofield. He was represented by counsel at that time, who provided the stand-ins for the lineup. No objection was made that the stand-ins were dissimilar in appearance to Cofield. Each of the four victims viewed the lineup separately and independently, and each identified Cofield.

Having made those findings, the judge ruled that as to Lynne and Mary the photographic identification procedure was not so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification. The judge further ruled on the basis of clear and convincing evidence and in consideration of the totality of the circumstances that the in-court identifications of Cofield by Mary and Lynne were independent of any improper procedures and were therefore valid. He found that the two girls gained certain impressions of Cofield as a result of their being

raped and robbed and that those impressions were not influenced by any subsequent events. He did not make such findings with respect to the male victims and therefore allowed the motions to suppress any identification by Paul or David.

Much of the defendant's argument on this point is devoted to "pointing out evidence tending to permit findings of fact contrary to those made by the judge." *Commonwealth* v. *McGrath,* 361 Mass. 431, 437 (1972). Our duty as an appellate tribunal, however, is not to substitute one set of findings for another but is to determine whether the judge's findings were supported by clear and convincing evidence. *Commonwealth* v. *Frank,* 357 Mass. 250, 254 (1970). *Commonwealth* v. *McGrath, supra,* at 437. See *Commonwealth* v. *Henley, ante,* 564 (1973). We reiterate that they were.

While there are obvious pitfalls in permitting victims to view photographs in each other's presence, the practice is not *ipso facto* invalid so as to preclude an identification made as a result thereof. See *Commonwealth* v. *Garvin,* 360 Mass. 846, 847 (1971); *Commonwealth* v. *Roberts,* 362 Mass. 357, 365-366 (1972); *United States* v. *Fitzpatrick,* 437 F. 2d 19, 26 (2d Cir. 1970). In the case at bar the judge's findings reflect his careful consideration of this procedure and of its possible drawbacks. His decision not to allow identifications by Paul or David illustrates those considerations. The defendant asserts that there is no support in the record for the distinctions drawn by the judge between the identifications made by Paul and David and those made by Lynne and Mary. We disagree. We think the judge's ruling, allowing the girls' identification testimony but not the boys', reflects an abundance of caution on his part and was intended further to insure the fundamental rights of the defendants to a fair trial. There was no error in admitting the identification testimony.

*Judgments affirmed.*