## Commonwealth vs. James J. Moynihan.

Suffolk. March 6, 1978. — September 26, 1978.

Present: Hennessey, C.J., Quirico, Braucher, Kaplan, Wilkins, Liacos,
& Abrams, JJ.

*"Threshold" Police Inquiry. Search and Seizure. Identification. Evidence,* Polygraphic test.

Where a police officer went to a parking lot at a police station for the purpose of determining whether an automobile in police custody matched the description of a getaway car used at an armed robbery, and, on looking through the windows of the automobile, observed in plain view clothing which he recognized as matching the description of the clothes worn by the robbers, the officer's warrantless seizure of the clothing was justified by the "plain view" doctrine. [470-474]

Where two witnesses to an armed robbery were simultaneously shown an array of photographs shortly after the robbery and one witness joined in identifying the defendant's photograph as that of one of the robbers after the other witness made the selection of the defendant's picture, the selection procedure was not so unduly suggestive as to require suppression of the former witness's identification of the defendant. [474-477]

For the reasons set forth in *Commonwealth* v. *Vitello, ante,* 426 (1978), a judge at a criminal trial did not err in limiting the use of polygraph evidence favorable to the defendant to corroboration of the defendant's testimony. [477-479] Quirico, J., concurring. Kaplan, J., concurring.

Indictment found and returned in the Superior Court on May 9, 1975.

A motion to suppress evidence was heard by *Dimond, J.,* and the case was tried before him.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Maurice F. Ford* for the defendant.

*Daniel C. Mullane*, Assistant District Attorney (*Michael J. Traft*, Special Assistant District Attorney, with him) for the Commonwealth.

LIACOS, J. The defendant was found guilty of armed robbery, G. L. c. 265, § 17, by a jury, following a trial made subject to the provisions of G. L. c. 278, §§ 33A-33G. He appealed to the Appeals Court. We transferred the case here on our own motion. G. L. c. 211A, § 10 (A). We affirm the judgment of the Superior Court.

The defendant's numerous assignments of error pertain to two basic issues: (1) whether the judge erred in denying the defendant's motion to suppress certain evidence; and (2) whether the judge erred in his rulings regarding the admissibility of polygraph evidence that was favorable to the defendant. Within these broad categories, we shall address each assignment of error that has been adequately argued. See *Commonwealth* v. *Martin*, 358 Mass. 282, 290 (1970).

1. *Defendant's motion to suppress.* The defendant moved to suppress: (a) evidence in the form of clothing taken by police from a car in which the defendant had been previously observed; (b) identifications made by two witnesses to the robbery. Following a hearing on the motion, the judge issued findings and rulings, and ordered that the motion be denied. The following descriptions of the underlying events are taken from the judge's findings, except where otherwise noted.

On November 25, 1974, at approximately 11:30 A.M., two men entered George's Market in Dorchester. In the market at the time were the proprietor, George Jakub, and a clerk, Daniel Stock. One of the men pointed a gun at Jakub and Stock and took money from the cash register. During the robbery, both Jakub and Stock clearly observed the robbers for several minutes. They told police that the man with the gun had glasses and wore a tan "rain-and-shine" coat and black "Russian-type" hat. The victims also described the other robber, noting, among other things, that he wore an "army-type" jacket.

(a) *Clothing taken from the car.* Officer John Smyth of the Milton police department was on routine patrol in a marked police car about noon on November 25, approximately one-half hour after the robbery. He was not aware that the robbery had occurred. As he stopped for traffic, he noticed two passenger cars parked in a large parking lot belonging to an American Legion post. Smyth knew that the parking lot was usually empty at that hour. He observed that one of the cars, a Plymouth, did not have a front license plate. He also observed three people, two males and a female, alighting from the Plymouth and walking a distance of about thirty yards to the second car, a four-door white Ford sedan with a black hood. A fourth person was seated in the driver's seat of the Ford. Smyth drove his car into the parking lot and parked near the Ford. At Smyth's request, the person in the driver's seat produced the car's registration, which was found to be in order, and indicated that the Ford was registered to the driver. Smyth then turned to the other occupants and asked them what was wrong with their car. The defendant replied, "What car?" Smyth said, "The car you just got out of." The defendant replied, "We didn't get out of any car." Smyth then asked everyone to get out of the car and they complied, leaving all the car doors open. As the defendant left the car, Smyth saw him move his hand toward the floor next to where he had been sitting in the back seat.

Smyth looked through the open rear door of the Ford and observed a gun clearly visible on top of clothing lying on the floor next to the back seat. Smyth reached in and picked up the gun, and asked the four former occupants, as a group, "Who belongs to the gun?" No one answered. Smyth repeated the question, and again there was no answer.[1] Smyth then placed the four persons under arrest for illegal possession of a firearm, and informed them of

---

[1] Smyth testified at trial that he then examined the gun, noting that it was fully loaded and that the serial number had been filed off.

their Miranda rights. The defendant then volunteered the statement: "I'll take my lumps. The gun belongs to me. The Plymouth is stolen. I stole it. The plates are in Swenson's car [the Ford] and in the trunk of the Plymouth." During this conversation, Smyth observed in plain view in the back of the Ford a tan rain-and-shine coat and a dark blue waist-length jacket, but he did not touch them. At Smyth's direction, the two cars were towed to an outside police parking lot behind the Milton police station. The cars were left unlocked.

At approximately 11:45 A.M. on the morning of the robbery Detective Richard M. Driscoll of the Boston police department arrived at George's Market and received descriptions of the two robbers. One of them was said to have been wearing a tan rain-and-shine coat, and the other an army-type jacket. The getaway car was described as a white Ford with a black hood. Driscoll subsequently learned that a car fitting that description was in the custody of the Milton police. On November 26, the day after the robbery, Driscoll went to the Milton police station parking lot where he observed the Ford that had been impounded by Smyth. The car was unattended and unlocked. Standing outside the car, Driscoll looked through the windows and saw lying in the rear, in plain view, a tan rain-and-shine coat and a blue army-type jacket. Driscoll opened a door of the car and took possession of the coat and jacket. He had no warrant to search or seize.

The defendant moved to suppress the gun taken from the Ford by Smyth, and the clothing taken from the Ford by Driscoll. In his brief, however, the defendant admits, as well he might, see, e.g., Commonwealth v. Anderson, 366 Mass. 394 (1974); Commonwealth v. Wilson, 360 Mass. 557 (1971); Terry v. Ohio, 392 U.S. 1 (1968); G. L. c. 41, § 98, that "Officer Smyth was acting properly in his threshold inquiry which resulted in his observations that led to the arrest of the defendants and the seizure of the automobile." The defendant does not argue that the sei-

zure of the gun was improper. We therefore focus only on the seizure of the clothing by Driscoll on the day after the robbery.

The judge found that Driscoll's warrantless seizure of the clothing was lawful and could be supported on two independent theories. First, the judge relied on *Chambers* v. *Maroney*, 399 U.S. 42 (1970), which held that a warrantless search of an automobile at the police station generally is not constitutionally distinguishable from an immediate search of the car on the highway under exigent circumstances and based on probable cause. See, generally, *Cardwell* v. *Lewis*, 417 U.S. 583 (1974); *Coolidge* v. *New Hampshire*, 403 U.S. 443 (1971); *Commonwealth* v. *White*, 374 Mass. 132, 141 (1977), cert. granted, 436 U.S. 925 (1978); *Commonwealth* v. *Haefeli*, 361 Mass. 271, 275-283 (1972), habeas corpus granted sub nom. *Haefeli* v. *Chernoff*, 394 F. Supp. 1079 (D. Mass.), rev'd, 526 F.2d 1314 (1st Cir. 1975). Second, the judge concluded that the "plain view" doctrine supported Driscoll's seizure of the clothing, citing our decision in *Commonwealth* v. *Ross*, 361 Mass. 665, 681-682 (1972), judgment vacated on other grounds, 410 U.S. 901, aff'd on rehearing, 363 Mass. 665, cert. denied, 414 U.S. 1080 (1973). We agree that the plain view doctrine is applicable to the facts of this case and that Driscoll's actions are fully justifiable under that doctrine. It is therefore unnecessary for us to consider the applicability of the *Chambers* case and its progeny.

On numerous occasions we have described and applied the plain view doctrine, relying principally on the exposition provided in *Coolidge* v. *New Hampshire*, 403 U.S. at 464-473. As summarized in *Commonwealth* v. *Walker*, 370 Mass. 548, 557, cert. denied, 429 U.S. 943 (1976): "The plain view doctrine requires prior police justification for an intrusion in the course of which an officer inadvertently comes across incriminating evidence. The 'prior justification' language is merely another way of articulating the necessity for 'some ... legitimate reason for being present unconnected with a search directed against [an]

accused.' *Coolidge* v. *New Hampshire, supra* at 466. The inadvertence requirement simply lends credibility to the doctrine by ensuring that only evidence which the police did not *anticipate* or *know* to be at the locus of a search will be seized without a warrant." We have also said that "mere evidence," as distinguished from contraband, fruits of crime and so on, may be seized only if the police recognize it to be plausibly related as proof to criminal activity of which they were already aware. *Commonwealth* v. *Bond*, 375 Mass. 201, 206 (1978).

The judge in the instant case made subsidiary findings of fact relevant to the application of the plain view doctrine, and we are bound to accept those findings absent clear error. See, e.g., *Commonwealth* v. *Hosey*, 368 Mass. 571, 574 n.1 (1975). There was no error. The record supports the view that Driscoll went to the parking lot at the Milton police station for the purpose of determining whether the white Ford in the custody of the Milton police matched the description of the getaway car he had received at the scene of the crime. The car properly had been removed to the security of the police parking lot, and Driscoll was entitled to proceed into the parking lot in furtherance of what were legitimate police investigatory duties. Cf. *Commonwealth* v. *Ross, supra* at 681 (preincarceration inventory was a legitimate police function forming basis for plain view seizure). See also *South Dakota* v. *Opperman*, 428 U.S. 364 (1976). Driscoll therefore had a legitimate reason for being in a position which occasioned his view of the coat and jacket. On seeing the clothing in plain view, and recognizing that the clothing matched the description of that worn by the robbers, Driscoll was justified in seizing the potential evidence. He did not conduct an extended general or exploratory search; he removed only the two articles of clothing.[2] See *Cool-*

[2] The instant case is thus to be distinguished from *Commonwealth* v. *Rand*, 363 Mass. 554, 557-558 n.1 (1973), in which we held the plain view doctrine inapplicable to evidence found after an hour-long examination of the vehicle at the police station.

*idge* v. *New Hampshire, supra* at 467 (seizure of object in plain view is consistent with objective of avoiding "general warrant" to rummage through a person's belongings); cf. *Cardwell* v. *Lewis,* 417 U.S. 583, 590-591 (1974) (traditional privacy interests are not implicated by "search" of car exterior, emphasizing plain view of evidence and lesser expectation of privacy in a motor vehicle).

(b) *Identifications.* The judge made the following findings of fact, which are fully supported by the record, regarding the exhibition of photographs to the two witnesses, Jakub and Stock. Within one or two days after the robbery Driscoll obtained a group of fourteen color photographs of men roughly fitting the description of the robbers. The pictures were not police "mug-shot" photographs, but were color Polaroid photographs giving a single front view of the faces of the subjects. No numbers or other identifying data appeared on the pictures.

Driscoll went to George's Market and asked Jakub and Stock to view the photographs. Nothing was said or suggested as to which of the subjects might have been involved in the robbery. Jakub and Stock independently selected one of the pictures as being that of the shorter of the two robbers. Stock picked the defendant's photograph as being that of the taller robber. After observing Stock make the selection of the defendant's picture, Jakub joined in identifying the defendant's picture as that of the taller robber. At the hearing on the motion to suppress, both witnesses affirmed their identifications of the defendant's photograph. Stock also testified that the defendant, who was seated in the dock, was the taller robber.

The defendant makes no objection to the array of fourteen photographs displayed to the witnesses, but does contend that the photographs were shown to the witnesses in an unduly suggestive manner. The judge specifically found and ruled, however, that the exhibition of photographs was fairly conducted and was not impermissibly suggestive. As we have already noted, subsidiary

findings of fact by the trial judge will be accepted by a reviewing court absent clear error. The ultimate legal conclusions to be drawn from the subsidiary facts, however, are matters for review. *Commonwealth* v. *Hosey*, 368 Mass. 571, 574 n.1 (1975). The legal standard to be applied in a case in which a photographic identification procedure is attacked as constitutionally invalid is whether the procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Commonwealth* v. *Mobley*, 369 Mass. 892, 895 (1976), quoting from *Simmons* v. *United States*, 390 U.S. 377, 384 (1968).

There is no need to discuss in detail the defendant's objections to the process by which Stock came to identify the defendant's picture. The judge's findings of fact with regard to that process, and his legal conclusion drawn from those facts, were clearly warranted. Nor is there reason for us to add to or alter the judge's findings of fact regarding the process by which Jakub identified the defendant's picture. We do pause to consider, however, whether the photographic identification procedure employed with regard to Jakub satisfied the legal standard of *Mobley* and *Simmons*.

At the suppression hearing, Jakub gave the following description of the photographic identification procedure: "And the next one [the defendant], my clerk [Stock] picked him out; and I went along with him. I verified it." Stock and Jakub had viewed simultaneously the array of fourteen photographs. Driscoll was present during the procedure but said nothing. In the course of determining that this procedure was not impermissibly suggestive, the judge placed appropriate emphasis on the considerations enumerated in *United States* v. *Wade*, 388 U.S. 218, 241 (1967).[3] In reviewing the judge's ruling, we are mindful

---

[3] Those considerations are: (1) the extent of the witness's opportunity to view the robber; (2) the general description given by the witness of the robber; (3) the absence of any error in either failing to identify

that "each case must be considered on its own facts." *Simmons* v. *United States, supra* at 384. "While there are obvious pitfalls in permitting victims to view photographs in each other's presence, the practice is not *ipso facto* invalid so as to preclude an identification made as a result thereof." *Commonwealth* v. *Cofield*, 1 Mass. App. Ct. 660, 667 (1974). We concluded in *Commonwealth* v. *Garvin*, 360 Mass. 846 (1971), that a photographic selection procedure similar to the one employed in the instant case was not improper under the *Simmons* standard. See also *Commonwealth* v. *Roberts*, 362 Mass. 357, 365 (1972). Although it would have been highly preferable for the two witnesses to have made their photographic selections independently, we do not think that the judge was wrong in concluding that the defendant failed to sustain his burden of showing that the procedure was impermissibly suggestive. See *Commonwealth* v. *Botelho*, 369 Mass. 860, 867-868 (1976). In so deciding, we place particular emphasis on the favorable conditions under which Jakub viewed the robbers and the short amount of time that elapsed between the robbery and the photographic identification. See note 3, *supra*. Cf. *Manson* v. *Brathwaite*, 432 U.S. 98

---

the defendant as the robber or in identifying some other person as the robber; (4) the lack of evidence that the police had made any suggestions to the witness concerning identification of the defendant; and (5) the relatively short period of time which elapsed between the commission of the crime and the identification of the photographs. *Commonwealth* v. *Mobley, supra* at 896. The judge properly emphasized in his findings the extent of the opportunity to see the robber at the time of the crime, perhaps the most important of the five considerations. See *Commonwealth* v. *Ross, supra* at 671. The judge found: "During the holdup both Jakub and Stock had clear unobstructed views of the two bandits under good lighting conditions. The experience left on the victims' minds clear impressions of the robbers' appearance. There is no discrepancy between the description that the victims gave to the police and the actual description of [the defendant] . . . . Nor have the victims identified anyone else as the robbers. Further, less than a day elapsed between the time of the holdup and the exhibition of the pictures to the victims."

(1977) (external indicia of reliability may outweigh suggestiveness of identification procedure); *Neil* v. *Biggers*, 409 U.S. 188, 199 (1972) (central question is whether, under totality of the circumstances, identification was reliable even though the confrontation procedure was suggestive). Compare *Commonwealth* v. *Botelho, supra* at 870-873. Although it is a close question, we think that this is a case in which the claimed weaknesses in the photographic identification process properly were left for consideration by the jury as bearing on the weight to be given the identifications. See *Commonwealth* v. *Jones*, 375 Mass. 349, 355 (1978).

2. *Admissibility of polygraph evidence favorable to the defendant.* Before the trial, the defendant moved that he be allowed to take a polygraph examination, at the expense of the Commonwealth, "for the purpose of introducing its result into evidence" at the trial. After a hearing before a judge, who was not the trial judge, the motion was allowed. The motion judge entered written findings to the effect that the defendant was fully competent to waive his constitutional right to assistance of counsel and privilege against self-incrimination, and that the defendant had made an intelligent, voluntary, and knowing waiver of such rights to the extent of allowing a polygraph examination to proceed. Among other findings the motion judge also found that John Cahalane, a polygraph examiner selected by the defendant, was qualified and experienced and therefore an appropriate person to administer the test.

Immediately after the Commonwealth rested, the defendant informed the trial judge at a bench conference that he intended to call Cahalane as his first witness. The judge ruled that Cahalane could not testify at that point, reasoning that polygraph evidence favorable to a defendant was not admissible "as an independent substance of evidence," but was only admissible to corroborate the defendant's testimony. This result followed from the judge's view that the polygraph measures only the de-

fendant's truthfulness and "does not relate as such to the substance of fact whether he did or did not commit the crime."[4] The defendant noted his exception and made an offer of proof as to the substance of Cahalane's expected testimony. The judge refused the defendant's request that his long criminal record not be used to impeach his credibility if he took the stand. The judge also ruled that a voir dire concerning the qualifications of the polygraph examiner and the propriety of the examination could not be conducted until after the defendant had taken the stand.

The defendant took the stand and testified that he had not participated in the robbery. The defendant said that on the morning of the robbery, he and another man were busy "casing" a bank to determine whether they should rob it, and that after the casing of the bank he had gone to a bar. He said he left the bar in the company of a woman and drove to the American Legion post parking lot in Milton, where he was subsequently arrested by Smyth. The prosecutor introduced in evidence the defendant's long record of criminal convictions for the purpose of impeaching the defendant's credibility.

The polygraph examiner, Cahalane, testified before the jury following a voir dire hearing on his qualifications and the propriety of the examination. He testified that, in his opinion, the defendant's answers to questions put to him while attached to the polygraph machine were not deceptive. The questions and answers would indicate that the defendant told the truth when he denied robbing George's Market and that his alibi story was truthful.

For reasons fully developed in *Commonwealth* v. *Vitello, ante* 426 (1978), we hold that polygraph evidence favorable to the defendant cannot be introduced as independent evidence of innocence but can be admitted to cor-

---

[4] The judge charged the jury in similar terms, adding that the corroborative weight to be given the polygraph testimony was to be determined by the jury.

roborate the defendant's testimony. The ruling of the judge in this case was therefore correct.[5] The defendant having decided to testify, his criminal record was admissible for impeachment purposes as provided in G. L. c. 233, § 21; see *Commonwealth* v. *Cook*, 371 Mass. 832 (1977). Although the judge should have granted the defendant's request that the voir dire of the polygraph examiner be conducted prior to his taking the stand, see *Vitello, supra,* part 1 (e) iii at 453, this error is harmless in view of the fact that the examiner was found to be qualified and his favorable testimony was received in evidence.

*Judgment affirmed.*

QUIRICO, J. (concurring in the result). In this case the trial judge refused to allow the defendant to offer evidence of the results of a polygraph test taken by him unless he first testified at the trial. After the defendant testified the judge admitted the polygraph evidence but limited the jury's consideration of the evidence to "the question of whether or not at the time of the examination the subject was telling the truth." The court holds that the evidence was properly admitted, and that it was properly limited to the corroboration of the defendant's testimony.

For the reasons stated in my concurring opinion in *Commonwealth* v. *Vitello, supra* at 461 (1978), decided this day, I would hold that the polygraph evidence was not properly admitted for any purpose. However, since it was favorable to the defendant, even if on the limited issue of corroboration, I would not reverse the judgment. I therefore concur in the result reached by the court.

---

[5] We attach no significance to the finding of the motion judge that the defendant understood that the polygraph results would be admissible in the trial in chief. Even if the defendant had agreed that the results could be used as independent evidence of guilt, the agreement would not be controlling. See *Vitello, supra* at 456 n.27.

KAPLAN, J., concurring, refers to his concurring opinion in *Commonwealth* v. *Vitello, supra* at 464, decided this day.