## Commonwealth vs. Joseph L. Allen.

Suffolk. March 5, 1979. — March 30, 1979.

Present: Hennessey, C.J., Quirico, Kaplan, Wilkins, & Abrams, JJ.

*Evidence*, Polygraphic test, Photograph, Relevancy and materiality.
*Practice, Criminal*, Instructions to jury.

In accordance with this court's decision in *Commonwealth* v. *Vitello*,
376 Mass. 426 (1978), the defendant was entitled to a new trial
where the Commonwealth had introduced the results of a poly-
graphic test of the defendant as part of its case in chief. [676-677]
Wilkins, J., concurring.

Evidence at a criminal trial warranted the judge's findings that an
examiner who had administered a polygraph test was qualified,
that the defendant was amenable to polygraphic testing, and that
the test conditions and questions were proper. [678]

At a murder trial, the judge did not abuse his discretion in admitting
photographs showing the nature of the wounds which caused the
victim's death even though they also depicted some post-mortem
deterioration. [678-680] Wilkins, J., concurring.

In ordering a new trial of a murder indictment on other grounds, this
court did not decide whether the admission of certain inflammatory
photographs, standing alone, would have been reversible error.
[680] Wilkins, J., concurring.

In reviewing a judge's charge in a criminal case, this court reiterated
its warnings against mention of the appellate process and against
use of a "personal decision-making" approach to the reasonable
doubt charge. [680-681]

Indictment found and returned in the Superior Court
on October 27, 1975.

The case was tried before *Hallisey, J.*

A motion for a new trial was filed in the Supreme
Judicial Court on November 8, 1978, after entry of the
defendant's appeal in that court.

*Beth H. Saltzman* for the defendant.

*Michael J. Traft,* Assistant District Attorney, for the Commonwealth.

QUIRICO, J. The defendant was convicted of murder in the first degree and is appealing therefrom under the provisions of G. L. 278, §§ 33A-33G. This appeal has been consolidated with the defendant's pending motion for a new trial, which he brought following the release of our decision in *Commonwealth* v. *Vitello,* 376 Mass. 426, 451-457 (1978), concerning the proper evidentiary use of polygraph test results. We grant the defendant's motion for a new trial because, under the rule of *Vitello,*[1] evidence of the results of a polygraph test taken by a defendant may be admitted only for the limited purpose of impeaching or corroborating his testimony after he has taken the stand. At the defendant's trial, conducted prior to the *Vitello* decision, evidence of the unfavorable results of a polygraph test which he took was admitted as independent evidence of his guilt during the Commonwealth's case in chief. We also comment briefly on the defendant's contentions in regard to the admission of certain photographs, and certain portions of the judge's charge, which might arise at a second trial.

On September 10, 1975, an employee of the owners of a building at 15 Park Vale Avenue in the Allston section of Boston went to apartment 4 to make repairs, and discovered the body of the victim, a seventy-two year old woman, lying on the floor. At that time, according to the medical examiner, she had been dead about two days, having died as a result of multiple blows to the head with a blunt instrument. A bloody hammer was found lying in a wastebasket near the body.

The defendant's brother, Richard Allen, who testified for the Commonwealth, was at that time the superintendent of the apartment building. He testified that the hammer found at the scene was his, and that it was sometimes

[1] And its accompanying case, *Commonwealth* v. *Moynihan,* 376 Mass. 468 (1978).

used by his brother, the defendant, who lived with him and helped with the maintenance work. The Commonwealth's evidence tended to show that on September 8, 1975, the defendant, while doing extermination work at 15 Park Vale Avenue, had gotten into an argument with the victim who lived in apartment 4, and had struck the fatal blows. There were no witnesses to the killing, but on the day the body was discovered the defendant told the police: "That was a bad thing I did, but she shouldn't have called me a black bastard."

While he was in jail awaiting trial, the defendant asked to speak to a detective, and told him that his brother had committed the murder. The defendant testified at trial that he had witnessed his brother kill the victim during an argument.

1. *The polygraph evidence.* Prior to trial, the defendant moved to be allowed to take a polygraph examination, agreeing in writing "that the results of any such examination are to be admissible if offered by any party irrespective of the result." The judge granted this motion after satisfying himself at a hearing that the defendant was voluntarily and knowingly waiving his Fifth Amendment rights. When the examination proved unfavorable to him, the defendant moved to suppress the results, but no hearing on the merits of this motion to suppress was held prior to trial.

The prosecutor was permitted to state in her opening to the jury, over the objection of the defendant, that William LaParl, the polygraph examiner, would testify that the defendant was not telling the truth when he denied involvement in the murder. Before the polygraph expert was permitted to testify before the jury, an extensive voir dire was held on his qualifications, his opinion of the defendant's fitness for such testing, and the conditions under which the test was administered. The judge then made thorough oral and written findings on these issues, ultimately concluding that evidence of the polygraph test was admissible under the standards set forth in *Common-*

*wealth* v. *A Juvenile*, 365 Mass. 421 (1974), which was then the governing law.

The subject of polygraph examinations, and whether and to what extent the results thereof should be admissible as evidence in criminal trials in this Commonwealth, has provoked a wide range of opinions among members of this court. Nonetheless, and regardless of what further experience with the introduction of such techniques into court proceedings may teach us, the law is now settled to be as set forth in *Commonwealth* v. *Vitello*, 376 Mass. 426 (1978):[2] that polygraph results may be admitted in the discretion of the judge, but only for the purpose of impeaching or corroborating the defendant's credibility if he testifies at his own trial.

Clearly, that limitation was not observed in this case. The Commonwealth does not argue that the *Vitello* rule should apply only to trials conducted after that decision, and we have already indicated we will not so confine it. *Commonwealth* v. *Malone*, 376 Mass. 931 (1978). As to the suggestion that the introduction of the polygraph evidence in this case may have been harmless error, because the defendant did in fact testify, several points effectively demonstrate the contrary. First, in view of the negative results of his polygraph test, the defendant might have chosen not to testify had not the prior admission of the test results made it advisable that he do so. Second, the defendant was entitled to, but did not receive, the benefit of an instruction "clearly advising the jury of the limited purposes for which the examiner's testimony is admitted," namely, the impeachment or corroboration of the defendant's testimony. *Commonwealth* v. *Vitello*, *supra* at 456-457. Finally, the evidence against the defendant in this case was not overwhelming. We cannot say that the unrestricted admission of the polygraph test results was harmless beyond a reasonable doubt.

---

[2] And its accompanying case, *Commonwealth* v. *Moynihan*, *supra*.

In the event that the defendant does choose to testify at a second trial, these polygraph test results will once again be potentially admissible, but solely for the purposes permitted by, and under the conditions laid down in the *Vitello* decision. For this reason, we address the defendant's contention that the judge abused his discretion in finding that the examiner was qualified, that the defendant was amenable to testing and that the test conditions and questions were proper. Specifically, the defendant argues that the substitution of one examiner (William LaParl) for the examiner originally suggested by the parties (Charles Zimmerman), the examiner's lack of a college degree, the administration of the test in an office at Charles Street jail rather than at a doctor's or psychologist's office, and the taking by the defendant of some medication several hours prior to the test rendered the examination results inadmissible as a matter of law. We do not agree. The trial judge heard extensive testimony and argument on all the factors relevant to determining the validity of the test, and made careful and thorough findings and conclusions thereon. He was satisfied that all prerequisites to admissibility had been met. The evidence warrants his findings and they in turn support his conclusions. Any differences between the administration of this polygraph examination and an "ideal" examination may be argued to the jury as going to the weight of the evidence, but they do not preclude admission of evidence of the test results.[3]

2. *The admissibility of the photographs.* Nine photographs and four color slides of the victim's head or body as it was discovered in a state of "moderately advanced decomposition" two days after the killing were admitted in evidence over the defendant's objections. Some of these photographs and slides were arguably objectionable, not

---

[3] If the defendant has new information, not appearing on this record, which might cast doubt on the validity of the polygraph test, he may present it to the judge for his consideration at a retrial.

only because of their generally gruesome appearance, but more importantly, because while they depicted conditions partly caused by the blows resulting in the homicide, they also depicted conditions resulting from the natural decomposition of the body in the days following the killing. The most potentially prejudicial, as the judge recognized, were two full body shots of the victim with her dress pulled up above her waist, showing bloody staining around the crotch. This staining, the medical examiner testified, was entirely the result of natural post-mortem decomposition, and entirely unrelated to the crime. All of the injuries inflicted on the victim were head injuries; there was no suggestion by the Commonwealth that the defendant committed any sexual acts or any violent acts other than the blows to the head of the victim.

It is this court's long-standing policy that "[t]he fact that photographs may be inflammatory does not render them inadmissible if they possess evidential value on a material matter." *Commonwealth* v. *Horton*, 376 Mass. 380, 398 (1978), quoting from *Commonwealth* v. *Stewart*, 375 Mass. 380, 385 (1978), and cases cited. We have always been extremely reluctant to reverse on the grounds of the improper admission of photographs of the deceased, particularly where the Commonwealth is pursuing a theory of murder committed with extreme atrocity or cruelty, as it is in this case. Compare *Commonwealth* v. *Richmond*, 371 Mass. 563 (1976), with *Commonwealth* v. *Bys*, 370 Mass. 350, 357-360 (1976). Here, the photographs of the victim's head possessed evidential value in showing the nature of the wounds which caused the victim's death, even though they also depicted some post-mortem deterioration.[4] We cannot say that the judge

---

[4] The medical examiner explained to the jury that both pre- and post-mortem conditions were reflected in the photographs and gave his opinion as to which changes occurred post-mortem.

The judge cautioned the jury in his charge to "make allowance" for the fact that some of what the photographs depicted were post-mortem changes.

abused his discretion in admitting these photographs even though another judge might have chosen to exclude some.

The photographs of the victim's bloody crotch, however, do not appear to be relevant to any material issue in the case. In addition they possess, as the judge himself recognized, great potential for inciting jury speculation about possible sexual overtones to the crime, speculation which might be highly prejudicial to the defendant. The judge initially instructed the Commonwealth to cut or cover over the lower portion of the whole body photographs, but ultimately these photographs went to the jury unaltered, accompanied by testimony that the staining was "solely and completely a product of the natural process of decomposition." We need not reach the question whether the admission of these photographs, standing alone, would have been reversible error, since we are granting a new trial due to the improper use of the polygraph evidence. But we do suggest that on retrial the judge scrutinize such photographs carefully to determine whether they possess evidentiary value of sufficient magnitude to outweigh their inherently inflammatory nature.

3. *The judge's charge.* The defendant contends that the judge erred by (1) describing the appellate process and (2) referring to a standard of certainty appropriate to undertaking a "very important step" in one's private life in his charge on the Commonwealth's burden of proof beyond a reasonable doubt. We merely point out that we have cautioned against mention of the appellate process, *Commonwealth* v. *Walker,* 370 Mass. 548, 574, cert. denied, 429 U.S. 943 (1976), and against use of a "personal decision-making" approach to the reasonable doubt charge, *Commonwealth* v. *Ferreira,* 373 Mass. 116, 128-129 (1977); *Commonwealth* v. *Ferguson,* 365 Mass. 1, 12, (1974), in prior cases. We reiterate the advice that such

references are best omitted from the charge, but we do not decide that reversible error was committed in this case on those grounds.

The defendant's motion for a new trial is granted, the verdict is set aside, and the case is remanded for a new trial. We do not reach the defendant's request for relief under G. L. c. 278, § 33E.

*So ordered.*


WILKINS, J. (concurring). I dissented in *Commonwealth v. Vitello*, 376 Mass. 426 (1978). See dissenting opinion of Braucher, J., *id.* at 465. I adhere to my earlier views but agree that the law suddenly established in the *Vitello* case calls for a new trial here. I join generally in the opinion of the court in its analysis of the issues in light of the *Vitello* decision. However, in my view, the admission of some of the photographs calls for a new trial in any event. Prosecutors should exercise restraint in offering inflammatory photographs of minimum relevance or, as here, of no relevance at all. If such restraint is not employed, judges should exercise their discretion to exclude such photographs.