COMMONWEALTH *vs.* ROBERT MARKS
(and three companion cases[1]).

Hampden. April 30, 1981. — October 16, 1981.

Present: HALE, C.J., GREANEY, & SMITH, JJ.

*Identification. Practice, Criminal,* New trial, Exhibits, Jury and jurors. *Jury and Jurors.*

At a hearing on a defendant's motion to suppress an out-of-court identification of him by two witnesses, a mother and daughter, who had been taken by police to a courthouse where the police expected the defendant to be present, evidence that there had been no prior identification of the defendant and the police had no probable cause to arrest him or detain him for investigative purposes, that the defendant was seated among spectators, and that there were many persons in the courthouse and the courtroom warranted the judge's findings that the police were justified in using the informal prearrest identification procedure and that the procedure was not so suggestive as to constitute a denial of due process [514-516]; however, where the witnesses were permitted to view the defendant jointly, with the result that the mother identified him in the presence of her daughter who then also identified him, the judge should have made findings as to whether the daughter's out-of-court and in-court identifications of the defendant had an independent source or were otherwise reliable [516].

At a criminal trial, evidence of the circumstances concerning a photographic array shown three witnesses warranted the conclusion that neither the array nor the procedure used was suggestive in any way. [516-517]

At a criminal trial, evidence of the circumstances concerning the defendant's identification in a lineup warranted findings that the lineup was not suggestive and that the defendant was not entitled to counsel since criminal proceedings had not been initiated against the defendant with respect to the crimes for which he was being identified. [517]

Defendants in a criminal case were entitled to a new trial because of the disappearance, during jury deliberations, of two photographic exhibits depicting individuals for whom the defendants claimed they had been mistaken where the primary issue at trial was one of identifica-

---

[1] One against Robert Marks and two against Josh Marks.

tion and the missing exhibits were the only evidence supporting the defendants' claim that the two individuals were "look-alikes." [518-522]

INDICTMENTS found and returned in the Superior Court on February 9, 1978.

The cases were tried before *Griffin*, J., and motions for a new trial were heard by her.

*Roy H. Anderson* for Josh Marks.

*Howard S. Sasson* for Robert Marks.

*William T. Walsh, Jr.*, Assistant District Attorney, for the Commonwealth.

SMITH, J. Robert Marks (Robert) and Josh Marks (Josh), brothers, were arrested and convicted by a jury of assault and battery by means of a dangerous weapon and armed assault in a dwelling house. They appeal from their convictions, claiming error in the denials of their suppression motions as to the identification procedures used by the police and the denials of their motions for new trial. The motions for new trial were based upon the loss of two photographic exhibits during the jury deliberations. In addition, Robert claims that he was denied the assistance of counsel at the time a lineup was held. See *Kirby* v. *Illinois*, 406 U.S. 682 (1972). We reverse the convictions because of error in the denial of the defendants' motions for new trial. We also note a flaw in the identification procedure used by the police which requires a new suppression hearing to be held.

1. *The motions to suppress identifications.* The defendants filed suppression motions in regard to their identifications by the victims. In the course of the investigation, the police employed three different identification procedures. They were (1) a confrontation in a courtroom; (2) a photographic identification; and (3) a lineup identification. The judge, after a hearing on the suppression motions, made detailed findings of fact in support of her ultimate conclusions that the identification procedures were not "so unnecessarily suggestive and conducive to irreparable mistaken identifi-

cation that [the defendants were] denied due process of
law." *Stovall* v. *Denno,* 388 U.S. 293, 301-302 (1967). We
shall accept her findings of fact as binding in the absence of
clear error, see *Commonwealth* v. *Correia,* 381 Mass. 65, 66
(1980); and we owe respect to her conclusions of law, but
"we are not bound by them." *Commonwealth* v. *Cincotta,*
379 Mass. 391, 392 (1979). We summarize the judge's find-
ings.

On October 3, 1977, about 3:45 A.M., members of the
Czochara family, consisting of Mr. and Mrs. Czochara and
their daughter, Michelle, age 14, were awakened by the
noise of persons in their home. Michelle saw two black
men, one near her bed and the other at the door a few feet
from the foot of her bed. The light in her room was not on,
but some visibility was possible because of light from street
lights and because the hall outside her room was lighted by
an amber colored light. Mr. Czochara awakened, got out
of bed, looked into the hall and saw a man facing him. A
struggle occurred during which Mr. Czochara was struck by
another man and knocked unconscious. When he revived,
he saw a man taller[2] than the one with whom he had been
struggling standing above him with his foot on Mr. Czo-
chara's chest. The man said, "I'm not like my brother."
This man took his foot off Mr. Czochara's chest and made
him get up. He forced Mr. Czochara into his bedroom. As
Mr. Czochara entered the room, he turned on the light and
saw Mrs. Czochara in bed. The taller intruder was in the
bedroom for several minutes while the light was on. Even-
tually, the intruders left, and the police arrived in answer to
a telephone call. The police took descriptions of the men
and later in the morning brought back a suspect, one James
Watson,[3] who seemed to fit the description of one of the in-
truders. The Czocharas stated that he was not one of the
men.

---

[2] Later, Mr. Czochara identified the taller man as Robert Marks.

[3] At trial, Josh claimed that Watson looked like him and that he was
mistakenly identified for Watson.

A. *Courtroom identification.* About December 8 or 9,
1977, the police apparently had reason to suspect that the
defendants were involved in the Czochara break. Josh was
to be arraigned on an unrelated charge in a District Court,
and the police expected that Robert would appear in court
with him. Mrs. Czochara and Michelle were taken to the
courthouse by the police on the morning of December 12,
1977. On entering the first floor corridor outside of the
courtrooms, they were told by the police to look around to
see if they recognized anyone. The corridor was crowded,
with both black and white persons of varying ages. They
did not recognize anyone. The police took them into a
courtroom where there were many young persons. Again,
they did not recognize anyone. They were then taken into
another courtroom where they first sat in the rear of the
room and then walked up the aisle to the front of the specta-
tor area. There were between twelve and fifteen people,
both black and white in the courtroom. On looking at the
spectators Mrs. Czochara, in the presence of Michelle, iden-
tified Robert as the intruder who had been in her bedroom.
Michelle then also identified Robert. Josh was seated beside
Robert but was not identified by Michelle.[4]

Robert argues that the confrontation arranged by the po-
lice was of a nonemergency nature and that the police
should have used a lineup conducted in accordance with
constitutional requirements. *Commonwealth* v. *Chase,*
372 Mass. 736, 742 (1977). The Supreme Judicial Court has
sustained the use of informal prearrest identification proce-
dures "conducted in nonemergency situations well after the
commission of the crime and not involving just the witness
and the defendant." *Commonwealth* v. *Chase, supra* at
743. *Commonwealth* v. *Napolitano,* 378 Mass. 599,
605-606 (1979). In this case, there had been no prior identi-
fication of Robert.[5] The police at the time of the confron-

---

[4] Mrs. Czochara never saw the second intruder in her home.

[5] The fact that there had been no prior identification distinguishes this
case from *Martin* v. *Donnelly,* 391 F. Supp. 1241 (D. Mass. 1974). In

tation did not have probable cause to arrest Robert, nor could they detain him for "investigatory purposes." *Commonwealth* v. *Napolitano, supra.* Under such circumstances, the police are allowed to conduct an investigation procedure similar to the one used in this case. *Commonwealth* v. *Chase, supra. Commonwealth* v. *Napolitano, supra.* However, our inquiry does not stop at this point because in this type of prearrest confrontation, there still must be a showing by the Commonwealth that the procedure used was not so suggestive as to constitute a denial of due process. *Commonwealth* v. *Chase, supra* at 744. The setting of the identification procedure was not suggestive. Robert was not isolated in a holding area but was seated among spectators. There were several persons, including blacks, in the courtroom. Therefore, the identification was not the result of a one-on-one confrontation. However, the police permitted Mrs. Czochara and Michelle to view the suspects jointly, with the result that Mrs. Czochara identified Robert in the presence of Michelle, who in turn identified him.[6] The fact that identifications are made by witnesses in the presence of each other does not, by itself, render the procedure impermissibly suggestive. *Commonwealth* v. *Moynihan,* 376 Mass. 468, 476 (1978). *Commonwealth* v. *Cincotta,* 379 Mass. at 394. There are obvious pitfalls in using this procedure. See *Commonwealth* v. *Moynihan, supra* at 476; *Commonwealth* v. *Cofield,* 1 Mass. App. Ct. 660, 667 (1974). Because of the pitfalls, the court in *Moynihan* placed particular emphasis on the conditions under which the second identifying witness viewed the criminal at the time of the crime and the interval of time between the

*Donnelly,* the courtroom identification was suppressed because the procedure was being used by the government to renew and improve the identifying witness's memory.

[6] As the courtroom identification took place prior to the decision in *Commonwealth* v. *Napolitano,* 378 Mass. 599 (1979), the police cannot be faulted for failing to follow the suggestions outlined in *Napolitano* for the correct procedures to be used in seeking an identification of a suspect in a courtroom. See *Commonwealth* v. *Napolitano,* 378 Mass. at 608.

crime and the identification. *Commonwealth* v. *Moynihan, supra* at 476. Because the courtroom identification in this case took place two months after the crime, the circumstances surrounding the observations of the intruder by Michelle are of considerable importance. The judge found that the procedure was not suggestive and therefore failed to examine the circumstances. That finding we do not question; the suggestiveness is found in the mother's making the identification in the presence of her daughter. The judge, therefore, should have made findings as to whether, irrespective of the suggestiveness in the procedure, the proposed in-court identification had an independent source, *Commonwealth* v. *Botelho,* 369 Mass. 860, 868 (1976), or was otherwise reliable. *Neil* v. *Biggers,* 409 U.S. 188 (1972). Since we hold that there must be a new trial, (see part 2 of this opinion), we believe that a new hearing should be held on the suppression motion relative to the identifications of Robert by Michelle. The judge presiding at the new trial should make complete findings relative to the totality of circumstances surrounding Michelle's identification, including the effect on her, if any, of her mother's prior identification. Separate findings should also be made as to the "independent source" and the "reliability" tests. See *Commonwealth* v. *Venios,* 378 Mass. 24, 28 (1979), and *Commonwealth* v. *Moon,* 380 Mass. 751, 758-759 (1980). If the judge concludes that Michelle's identification should be suppressed, further consideration should be given to the effect of the suppressed identification upon the photographic identification of Robert by Michelle discussed in part B of this opinion.

B. *The photographic identification.* On the same day as the courtroom identification, Mrs. Czochara and Michelle were brought to the police station and were separately shown an array of twelve mugshots of black males.[7] The

---

[7] A few days after the crime, Mr. Czochara and Michelle viewed apparently two hundred photographs at the police station. Michelle selected one photograph as either the intruder or a "look alike." The photo-

array included photographs of Robert and Josh and also James Watson and one Kenneth Marks.[8]  Michelle selected the photographs of both Robert and Josh, and Mrs. Czochara picked out a photograph of Robert.  Later that day Mr. Czochara was called to the police station and shown the same array.  He also selected the photographs of both Robert and Josh.  We agree with the trial judge's conclusion that neither the photographic array nor the procedure used was suggestive in any way.  In regard to Michelle's identification of Robert, see part A of this opinion.

C.  *The lineup identification and lack of counsel claim.* After he was identified at the District Court, Robert was arrested on an outstanding warrant for a motor vehicle violation and was taken to the police station.  When Robert was informed that he had been identified as one of the persons involved in the break into the Czochara home, he stated that the identification was a mistake and that he was often confused with his cousin, Kenneth Marks.  He requested a lineup which was held the following day.  The lineup consisted of five persons, all black, and it included Kenneth Marks.  Mr. and Mrs. Czochara viewed the lineup separately and identified Robert as the intruder.  We agree with the trial judge that the lineup was not suggestive.  At the time of the lineup, Robert was not the subject of a complaint or indictment as to these offenses.  The right to counsel attaches only when there has been a "formal charge, preliminary hearing, indictment, [or] information" (*Kirby* v. *Illinois,* 406 U.S. at 689) with respect to the particular crime as to which the suspect is being identified.  *Boyd* v. *Henderson,* 555 F.2d 56, 61 (2d Cir.), cert. denied, 434 U.S. 927 (1977).  *Commonwealth* v. *Napolitano,* 378 Mass. 599, 605-606 (1979).

---

graph was not of either of the defendants, and there was no evidence that the photograph of either was included in the array.  Later, Mrs. Czochara viewed a group of photographs but did not select any photograph, and there was no evidence that either defendant's photograph was included in the array.

[8] At trial, Robert claimed that Kenneth Marks resembled him and that he was mistakenly identified for Kenneth Marks.

2. *Denial of motions for new trial.* Both defendants claim error in regard to the denial by the judge of their motions for new trial. The defendants argue that the unexplained disappearance of two exhibits during a portion of the jury's deliberations constituted a denial of due process. The judge heard arguments, reviewed the record, and filed findings of fact which we summarize.

The primary issue at trial was one of identification. Both defendants attempted to establish that they had been mistakenly identified by the victims throughout the series of identification procedures. In support of their claims, the defendants produced evidence that each had a "look-alike," a person for whom he had been or could be mistaken. In the case of Robert, the "look-alike" was one Kenneth Marks, a cousin of both defendants. In the case of Josh, the person was James Watson. Photographs of Kenneth Marks and Watson were introduced in evidence and were two of the seven exhibits which went to the jury room with the jury.[9] On November 20, 1979, after the closing instructions by the judge and after an inventory of the exhibits by all counsel, the jury retired for deliberations at 12:20 P.M. An envelope containing all the exhibits was delivered to the foreman, together with copies of the indictments and blank verdict slips. At 4:14 P.M., the jury were brought back into the courtroom and, after instructions by the judge, were dismissed for the day. See Mass.R.Crim.P. 20(e)(3), 378 Mass. 892 (1979). The foreman gave the exhibits to the session clerk who took the envelope to the clerk's office where

---

[9] The list of all the exhibits which were introduced at trial by the Commonwealth included the following:

1. Photo of 5-person lineup, including Robert Marks and Kenneth Marks.
2. Photo of Robert Marks and Kenneth Marks.
3. Police "911 Report".
4. Sanitized mugshot of Josh Marks.
5. Sanitized mugshot of James Watson.
6. Sanitized mugshot of Robert Marks.
7. Sanitized mugshot of Kenneth Marks.

it was held in a safe overnight.[10]  On November 21, 1979,
the clerk took the envelope from the safe, brought it to the
courtroom, and gave it to the foreman.  The jury withdrew
to continue deliberations at 10:01 A.M.  At approximately
10:45 A.M., the jury sent a question to the court inquiring
whether their deliberations were limited to the issue of iden-
tification or if they could consider whether or not a gun was
involved.  At 11:05 A.M. the jury were brought into the
courtroom, further instructed by the judge, and withdrew
to continue deliberations.  About noon, the judge instructed
the court officer to take lunch orders from the jurors.  The
foreman told the court officer that two exhibits were miss-
ing — exhibit 5 (sanitized mugshot of Watson) and exhibit 7
(sanitized mugshot of Kenneth Marks).  The officer immed-
iately told the judge who, in turn, directed an officer to in-
struct the foreman and jurors to check through their papers
carefully.  The officer returned and stated that the missing
exhibits had not been found.  At about 12:15 P.M. the court
was not in session, but the judge was in the courtroom talk-
ing to the court reporter and clerk about the missing ex-
hibits.  The lawyer for Robert was present in the courtroom
and was told about the missing exhibits, but neither the as-
sistant district attorney nor the attorney for Josh was pres-
ent, and the judge made no attempt to reach them.  There
was no communication from the judge to the jury in regard
to the exhibits.  The jury continued to deliberate and short-
ly after 2:30 P.M. returned verdicts of guilty on all charges.
After the verdicts, the judge informed the lawyers and the
defendants about the missing exhibits.  The foreman was
asked to remain and was briefly questioned by the judge
about the missing exhibits.  The questioning took place in
the presence of the attorneys and the defendants.  The fore-
man stated that the jury first noticed that the two exhibits

---

[10] The transcript does not indicate, and the judge's findings are silent, as
to whether the exhibits were inventoried at the time the jury separated for
the day or at the time the jury regained possession of them the next morn-
ing.

were missing just before the lunch orders were taken. The foreman also stated that the jury had "dealt with" the exhibits on the previous day during its deliberations. The judge in denying the motions considered these factors: (1) the nature of the irregularity; (2) the chronological point during the jury's deliberation period at which the irregularity occurred; and (3) the amount of time, both quantitatively and as a percentage of total deliberating time, that the jury could possibly have been influenced by the irregularity. The judge held that the irregularity in this case was not inherently offensive misconduct, such as jury tampering, and that the jurors first realized that the exhibits were missing after they had deliberated for approximately six hours. Further, the judge noted that the jury deliberated for a total time of approximately eight hours, of which time it appears they were aware of the missing exhibits for a total of no more than two and one-half hours.

Generally, the disposition of a motion for new trial is a matter reserved to the sound discretion of the judge. *Commonwealth* v. *Dascalakis*, 246 Mass. 12, 25, 32 (1923). *Earl* v. *Commonwealth*, 356 Mass. 181, 184 (1969). *Commonwealth* v. *Cook*, 380 Mass. 314, 320 (1980). *Commonwealth* v. *Markham*, 10 Mass. App. Ct. 651, 654-655 (1980). However, if the original trial was infected with prejudicial constitutional error, the trial judge has no discretion to deny the motions. *Lannon* v. *Commonwealth*, 379 Mass. 786, 788 (1980). The judge was faced with a problem that had never arisen before in the Commonwealth and, indeed, had occurred but rarely in the nation in any reported case.[11] The constitutional right to a fair trial includes the right to a fair final decision. To

---

[11] Counsel for both parties were unable to cite any case in their briefs that involved the problem of missing exhibits during jury deliberations. Our research disclosed one case in the nation that involved the problem. In *People* v. *Lee*, 38 Cal. App. 3d 749 (1974), an overzealous custodian threw out exhibits during the jury deliberations. The court upheld the denial of a new trial on the ground that no showing was made that the evidence would have helped the defendant in any way.

insure this, the jury are usually told that each juror must decide the case for himself, but only after an impartial consideration of all the evidence, that a juror should not hesitate to reexamine his or her own views, and to change his or her opinion, if convinced it is erroneous, and that an honest opinion as to the weight or effect of evidence should not be surrendered solely because it conflicts with the opinions of other jurors. The central issue here — common to both indictments — was the issue of identification. It must be assumed, in the absence of a compelling showing to the contrary, that this issue remained open and that the jury were conscientiously discussing it, under the above standards, up until the time the verdicts were returned. On that assumption, the loss of the exhibits could have effectively precluded the jury from fulfilling their obligations and from settling any doubts they might have had as to the sufficiency of the Commonwealth's proof of identification. The missing exhibits were critical to the defendants, as their entire defense was based upon the contention that the defendants were mistakenly identified for others. Neither "look-alike" was seen by the jury and the only way they could have compared the features of the defendants with the two persons the defendants claim had committed the crime was by the use of the two missing exhibits. We cannot accept the opaque finding that the jury had "dealt with" the exhibits the previous day as dispelling the assumption that the identification issue was still open or as satisfying the constitutional fair trial guarantee. This is particularly so in view of (1) the failure of the judge to communicate with the jury after being informed of the missing exhibits, a failure which could have had the effect of relegating the exhibits, in the jurors' minds, to a minor status; (2) the concern manifested by the jury's question propounded earlier in the day; and (3) the time spent by the jury in deliberating after the exhibits were reported missing. Nor can we accept, on this record, the denial of a new trial based on a reduction of the deliberative process to a fraction represented by the number of hours the jury spent without the exhibits and the

number of hours they spent with them. Therefore, we hold that, under the circumstances of this case, the defendants were denied due process. We do not hold that in every case where exhibits are lost during jury deliberations the judge must either declare a mistrial or order a new trial. In many cases, exhibits are introduced in evidence that are not material to the issue of innocence or guilt. For example, a certificate introduced as an exhibit under G. L. c. 111, § 13, is relevant but not material in a case where the defendant does not contest the nature of the narcotic but denies that he sold the drug. At times, exhibits are cumulative of oral testimony. In this case, the exhibits were not merely cumulative but rather were the means by which the jury could test the defendants' contentions. We do not attempt to establish guidelines in this case as to procedures to be followed where exhibits are lost during jury deliberations. We do suggest, however, that where jurors are separated after deliberations have commenced, an inventory of the exhibits be made before they separate and then again before they resume deliberations.

The order denying the motions for new trial are reversed, and orders are to enter allowing the motions.

*So ordered.*