COMMONWEALTH vs. RONALD THORNLEY.

Norfolk. March 2, 1987. — July 2, 1987.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Practice, Criminal,* Conduct of prosecutor, Findings by judge. *Identification. Evidence,* Composite drawing, Identification, Hearsay.

At the trial of indictments the prosecutor did not conduct himself improperly so as to prejudice the defendant. [358-359]

At a criminal trial, a composite sketch, depicting a person very similar in appearance to the defendant, was properly admitted as substantive evidence of identification where police procedure in the construction of the sketch, during a single session in which two eyewitnesses and a police officer jointly participated, was not shown to be so impermissibly suggestive as to give rise to a substantial likelihood of misidentification. [359-361]

A composite sketch, which was developed on the basis of a description given by a witness who later was not available to testify at trial and which was introduced in evidence through the testimony of a witness who adopted the sketch as a fair and accurate representation of the suspect, was not a statement excludable under the hearsay rule. [361-362]

At the hearing on a motion to suppress as suggestive a photographic array from which the defendant was identified, where the judge's findings were inconsistent on the issue of suggestiveness, the case was remanded in order that the findings be clarified and for reconsideration of the admissibility of subsequent lineup and in-court identifications. [362-364]

LIACOS, J., dissenting, with whom O'CONNOR, J., joined, was of opinion that prejudicial error occurred in the admission of the composite sketch and in the admission of the identification from the photographic array. [365-368]

INDICTMENTS found and returned in the Superior Court Department on May 4, 1983.

A pretrial motion to suppress evidence was heard by *Roger J. Donahue,* J. The cases were tried before *Herbert Abrams,* J., and a motion for a new trial was heard by him.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Robert J. Schilling* for the defendant.

*Stephanie Martin Glennon,* Assistant District Attorney, for the Commonwealth.

HENNESSEY, C.J. The defendant, Ronald Thornley, was found guilty by a jury in Superior Court of assault with intent to murder and assault and battery by means of a dangerous weapon. Prior to trial, the defendant filed a motion to suppress identification testimony regarding an "Identikit" composite sketch, a photographic array, and a lineup in which the defendant participated, claiming that the identification procedures were unnecessarily and unconstitutionally suggestive under both the Federal and State Constitutions. That motion was denied. Following trial, the defendant filed a motion for a new trial, alleging that prosecutorial misconduct had deprived the defendant of a fair trial. This motion was also denied. The defendant appealed and we transferred the case to this court on our motion. We remand the case to the Superior Court for further findings as to the identification procedures.

We summarize the facts as found by the motion judge. At approximately midnight on July 28, 1982, Harvey Davis, the victim, was at the bar in the lounge of the Stadium Motor Inn in Wrentham, which he owned. Also at the bar was Owen McCarthy, a maintenance man, and Noreen Floyd, the bartender. At approximately 12:30 A.M., two men entered the lounge and sat at the bar. The two men were in close proximity to Davis, McCarthy, and Floyd. The bar area was well-lighted, and there was no evidence that Davis, McCarthy, and Floyd were "anything other than sober, observant and rational persons." Davis left the bar at approximately 1 A.M. Shortly thereafter, the two men left by the same door, which, according to testimony, McCarthy unlocked in order to let them out.

Davis proceeded home, parked his car on the street, and walked toward his home. There was artificial lighting along the street. A car pulled up, and a man alighted from it, approaching and grabbing Davis from behind. Davis turned around, and an altercation ensued. Davis struggled with the assailant, broke free of him, and ran across the street. The man then shot Davis twice. During the struggle Davis and his

assailant were face to face. Davis recognized the assailant as one of the two men he had seen earlier at the bar. Davis then drove to the Wrentham police station. He described the incident to the police, referring them to people present at the bar for inquiry about his assailant's description.

At approximately 2 A.M., Wrentham police officers visited Floyd and McCarthy at the motor inn. In separate conversations with them, the officers obtained descriptions of each of the two men present earlier that morning at the bar. In the afternoon of July 29, Wrentham police officer Detective John Barrett visited Davis at a hospital, where he obtained from Davis a description of the assailant.

In the morning of July 30, Detective Barrett went with Floyd and McCarthy to the police station where they worked jointly with an "Identikit" to develop composite sketches of the two men they had seen at the bar. Detective Barrett was seated at a table, with Floyd and McCarthy sitting across from him. Barrett elicited descriptions from them both and made changes on the Identikit composite sketches, in order to produce likenesses more or less similar to the men in question. One of the Identikit sketches created was very similar to the defendant's appearance, even to the glasses worn by him.

Later in the day, Detective Barrett again visited Davis at the hospital. He showed Davis a photocopy of the Identikit composite sketches. Although Davis suggested that the weight and height of the man who had held the gun was somewhat inaccurate as stated on the sketch, no changes were made to the sketch or the written description as a result of Davis' suggestions.

On November 12, Detective Barrett visited the Stadium Motor Inn to show a photographic array to Davis, Floyd, and McCarthy. In separate sessions, he gave each of them the same set of thirteen photographs to view. The photographic array consisted of front and side view photographs of nine individuals and front views of four others. The picture of the defendant was one of the front and side view photographs. All thirteen persons pictured were white males whose ages approximated that of the defendant. Five of the men had moustaches, and

the remainder, including the defendant, were clean shaven. The picture of the defendant showed him wearing glasses. None of the other men in the array were shown with glasses. Davis selected the picture of the defendant, identifying him as the man who assaulted him with the gun. Both McCarthy and Floyd selected the picture of the defendant, identifying him as one of the two men they had seen at the bar the night Davis was shot.

On November 19, Detective Barrett went with Davis, Floyd, and McCarthy to Rhode Island, where the defendant had been arrested, for a lineup identification. The defendant was represented by counsel throughout the lineup procedure. The lineup was conducted in three separate sequences. At defense counsel's request, the order in which people were standing was changed with each sequence. The lineup included seven white males all of an age and appearance similar to that of the defendant. All of them were wearing glasses. Both Davis and McCarthy picked out the defendant at the lineup as one of the men they saw the night Davis was shot. While Floyd identified another man, not the defendant, in the lineup, she did say that if the defendant's hair were "grayer," she would have identified him as the man in the bar.

At trial, both Davis and McCarthy made positive in-court identifications of the defendant. They also testified as to their identifications from the photographic array and at the lineup. The photographic array and photographs of the lineup were admitted in evidence. Although Davis stated that he had selected the defendant's photograph from the photographic array, he misidentified, on the photograph of the lineup, the individual that he had selected at the lineup. The Identikit composite sketch was also admitted in evidence at trial. Because Floyd could not be located at the time of trial, her testimony was not available.

1. In a motion for a new trial, the defendant argued that the prosecutor engaged in improper conduct throughout the trial, including closing arguments. He specifically claimed that the prosecutor attempted, on four separate occasions, to bring to the jury's attention a certain photograph of the defendant

that was ruled inadmissible on each occasion after objection by the defendant. The defendant further maintained that the prosecutor asked improper questions of a defense witness in an attempt to prejudice the jury against the defendant. Also, he argued that, in closing arguments, the prosecutor overstated the evidence and injected his opinion into a characterization of the quality of the evidence. This motion was denied.

After a review of the record, we conclude that the prosecutor did not conduct himself improperly so as to prejudice the defendant. Certainly the trial judge was in a position to observe whether the photograph that was not admitted in evidence was held in such a manner that it was brought to the jury's attention. See *Commonwealth* v. *Barrasso*, 342 Mass. 680, 684-685 (1961). Furthermore, we conclude that if any impropriety occurred during the course of cross-examination or in final arguments, it was adequately remedied through the judge's instructions to the jury. *Commonwealth* v. *Kozec*, 399 Mass. 514, 517-518 (1987), and cases cited. *Commonwealth* v. *Winter*, 9 Mass. App. Ct. 512, 532-533 (1980). Consequently, the judge did not err in denying the defendant's motion for a new trial.

2. The defendant argues that the motion judge erred in not suppressing the Identikit composite sketch because the police procedure used to create the sketch was suggestive under our opinion in *Commonwealth* v. *Weichell*, 390 Mass. 62, 68-73 (1983), cert. denied, 465 U.S. 1032 (1984). In this case, both McCarthy and Floyd participated in a single session with Detective Barrett to produce the composite sketch. The defendant maintains that this procedure blurred any differences between the perceptive abilities and impressions of the two witnesses. He argues that the proper procedure would be to have each witness preserve his or her recollection in composite form and only then to combine their impressions into a single work.

In *Commonwealth* v. *Weichell, supra,* we overruled our earlier opinion in *Commonwealth* v. *McKenna*, 355 Mass. 313, 326-327 (1969), and concluded that an Identikit composite sketch may properly be admissible as substantive evidence of identification. However, we also stated that "identification by composite will be set aside if the pretrial identification process

was so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification." *Commonwealth* v. *Weichell, supra* at 73, citing *Simmons* v. *United States,* 390 U.S. 377, 384 (1968); *Commonwealth* v. *Mobley,* 369 Mass. 892, 895 (1976). We do not believe that the procedure used by the police in this instance creates the type of suggestiveness contemplated in *Weichell.* See *Commonwealth* v. *Weichell, supra* at 84 (Liacos, J., dissenting). Although both *Simmons* and *Mobley* involve identifications from photographs of the suspect, their analysis is useful in this context. Both cases were concerned with police manipulation of the photographic array in order to highlight or suggest to the witness a particular suspect. *Simmons* v. *United States, supra* at 383-385. *Commonwealth* v. *Mobley, supra.* There was no such manipulation in this case because, at the time that the composite sketch was constructed, the police had no suspect identified but had only the descriptions provided by Davis, McCarthy, and Floyd. The motion judge specifically found that "there was no suggestiveness on the part of the police to the identifying witnesses in the preparation of the identikit sketch of the defendant . . . ."

Nevertheless, the defendant contends that the degree of interaction between McCarthy and Floyd in creating the composite would be more than sufficient to require suppression of a joint selection from a photographic array. In a case involving a photographic array, we stated that "[w]hile there are obvious pitfalls in permitting [witnesses] to view photographs in each other's presence, the practice is not *ipso facto* invalid so as to preclude an identification made as a result thereof." *Commonwealth* v. *Moynihan,* 376 Mass. 468, 476 (1978), quoting *Commonwealth* v. *Cofield,* 1 Mass. App. Ct. 660, 667 (1974). As in *Moynihan,* we place particular emphasis on the favorable conditions under which McCarthy and Floyd viewed the two men in the bar and the short time that elapsed between their observations and the development of the composite sketch. *Commonwealth* v. *Weichell, supra* at 80, 84-85 (Liacos, J., dissenting). Consequently, we do not believe that the defendant has met his burden of proving that the process used to create the composite sketch was "so impermissibly suggestive as to give rise

to a substantial likelihood of irreparable misidentification."
See *Commonwealth* v. *Correia*, 381 Mass. 65, 77-78 (1980);
*Commonwealth* v. *Venios*, 378 Mass. 24, 26-27 (1979); *Commonwealth* v. *Botelho*, 369 Mass. 860, 867 (1976).[1]

The defendant next argues that because of Floyd's participation in developing the composite sketch and her subsequent absence from trial, the admission of the Identikit sketch introduced hearsay statements of her descriptions of the suspect which would not otherwise be admissible. See *Commonwealth* v. *Weichell, supra* at 71-72. This argument, however, overlooks part of the reasoning in *Weichell*. Our opinion in *Weichell* concluded that Identikit sketches are admissible as substantive evidence of identification "either because the composite retains the character of the statements that led to its creation *or* because the composite is not a statement within the meaning of the hearsay rule" (emphasis added). *Id*. at 72. Under this latter line of reasoning, the Identikit sketch does not fall within the hearsay rule.

In *United States* v. *Moskowitz*, 581 F.2d 14 (2d Cir.), cert. denied, 439 U.S. 871 (1978), the court concluded that a sketch prepared by a police artist at the direction of two witnesses was not a statement for purposes of the Federal Rules of Evidence and thus was not hearsay. "The sketch itself, as distinguished from [the witnesses'] statements about it, need not fit an exception to the rule against hearsay because it is not a 'statement' and therefore can no more be 'hearsay' than a photograph identified by a witness." *Id*. at 21. The court further

---

[1] The dissent's objection to the Identikit sketch focuses on the alleged suggestiveness inherent in a process where two witnesses participate in the development of an Identikit sketch. The dissent contends that such a process should render the sketch inadmissible "*at least*, where one of the witnesses later misidentifies a person in a fair lineup and then is unavailable for trial examination." The fact that the unavailable witness had later misidentified the defendant in a lineup is not as probative on the question of suggestiveness as the dissent implies, considering that she stated that she would have selected the defendant if his hair had been grayer. Furthermore, both witnesses had similar opportunities to observe the defendant for the same amount of time and under the same lighting conditions. McCarthy may even have had a better opportunity to observe the defendant when he unlocked the door as the defendant left the bar.

reasoned that the descriptions given to produce the sketch are not the proper object of a hearsay objection because "[t]he sketch is irrelevant until there has been evidence that it was the subject of a prior identification made by a witness." *Id.* In this case, the Commonwealth did not attempt to introduce through McCarthy the identification of the composite by Floyd or statements of her description of the men in the bar offered during the process of creating the composite sketch. McCarthy adopted the composite sketch as a fair and accurate representation of one of the men that he had seen in the bar and testified only as to that identification. Thus, no hearsay is involved.[2]

The rule that a composite sketch is not a statement for purposes of the rule against hearsay was also accepted in *State* v. *Packard*, 184 Conn. 258, 272-275 (1981) (The composite sketch "was more akin to a sketch, photograph, map, chart or other pictorial, graphic or schematic illustration which are not statements, but nonverbal modes of testimony"). Another court has held composite sketches admissible generally. *State* v. *Ginardi*, 111 N.J. Super. 435, 450-456 (1970), aff'd, 57 N.J. 438 (1971) ("In each case the eyewitness' statement is that what he sees, be it a photograph or a composite sketch, looks like the offender").

3. The defendant argues that the motion judge erred in not suppressing the identifications from the photographic array because the procedure used was suggestive in violation of the defendant's rights under the Fifth and Fourteenth Amendments to the United States Constitution. He further argues that because the photographic array was unnecessarily suggestive, the sub-

---

[2] The dissent suggests, "I doubt that the other composite witness's (McCarthy's) presence at trial would satisfy the majority as to the lack of confrontation of Floyd if McCarthy had been asked to relate — for purposes of identifying the defendant — whether Floyd had orally identified the defendant extrajudicially." *Infra* at 366. This statement is not inconsistent with the above reasoning and is not applicable in this instance, where no such inquiry was made of McCarthy. A rule that the composite sketch is not a statement within the meaning of the hearsay rule would not allow McCarthy to testify that Floyd also identified the sketch as presenting a likeness of the suspect. Within this rule, such a statement by Floyd would constitute hearsay if introduced through McCarthy.

sequent lineup and in-court identifications were tainted and should not have been admitted in evidence.

"Under our decisions a criminal defendant has the burden to prove, by a preponderance of the evidence, that the witness was subjected by the State to a pretrial confrontation, either photographic or in person, 'so unnecessarily suggestive and conducive to irreparable mistaken identification' as to deny the defendant due process of law. On a showing of such a confrontation, depending on 'the totality of the circumstances surrounding it,' evidence of the confrontation must be excluded at trial. Should the prosecution then desire to offer other identification testimony, it must show by 'clear and convincing evidence' that the identification has a source independent of the suggestive confrontation." *Commonwealth* v. *Venios*, 378 Mass. 24, 26-27 (1979), quoting *Commonwealth* v. *Botelho*, 369 Mass. 860, 865-868 (1976).

The motion judge found that the photographic array contained thirteen photographs, and that in only the defendant's photograph was the subject pictured wearing glasses. He found that "the photo array, shown to the identifying witnesses on November 12, 1982, was only suggestive in that the defendant had glasses on. Otherwise, there was no suggestiveness." He also found that "there was no suggestiveness affecting identification procedures" and that the Commonwealth had proved "to a point beyond reasonable doubt" that the identifying witnesses were relying "upon their view of the defendant on the night of the shooting" during the identification procedures. These latter findings are inconsistent with the former finding that the array was suggestive in that the defendant was the only individual pictured in the array wearing glasses. While the latter findings could be interpreted as a determination by the judge that the array was not sufficiently suggestive to constitute a deprivation of due process under our opinion in *Commonwealth* v. *Botelho, supra*, our review of the record cautions that this issue be remanded in order that the findings be clarified. For example, the record indicates that descriptions provided to the police by the witnesses immediately after the incident stated that one of the two individuals involved wore

glasses. Furthermore, the suspect's glasses were a prominent feature in the Identikit composite sketch, and both Davis and McCarthy testified that the subject's glasses were a factor in their selection of the defendant's picture from the photographic array. Also, the lapse of time between the crime and the identification may have contributed to the suggestiveness of the array.

Photographic identification procedures are constitutionally invalid if the procedures were "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons* v. *United States*, 390 U.S. 377, 384 (1968). The photographic procedures are to be examined in light of the total circumstances of the case. *Id.* at 383-384. Our cases and those of the United States Supreme Court have emphasized the following factors to be considered in evaluating the likelihood of misidentification: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil* v. *Biggers*, 409 U.S. 188, 199 (1972). *Simmons* v. *United States, supra* at 385. *United States* v. *Wade*, 388 U.S. 218, 241 (1967). *Commonwealth* v. *Mobley*, 369 Mass. 892, 896 (1976). *Commonwealth* v. *Botelho, supra* at 869.

Because, as shown in the evidence and found by the motion judge, there was an element of suggestiveness in the photographic array, this case is remanded to the Superior Court for the motion judge's further analysis and findings of fact as to the photographic array, in accordance with the *Simmons* and *Wade* criteria, and for reconsideration of the issues whether the lineup identifications and in-court identifications which followed the photograph identifications by the witnesses were properly admitted in evidence. See *Commonwealth* v. *Mobley, supra* at 895-897 (in-court and out-of-court identifications properly admitted in evidence as determined by judge's application of *Simmons* and *Wade* criteria).

*So ordered.*

LIACOS, J. (dissenting, with whom O'Connor, J., joins). The court concludes today that the admission in evidence of a composite picture, shaped in significant part by the efforts of a witness whose absence at trial is unexplained, does not constitute reversible error. The court so concludes, even though the same witness, in the only fair identification procedure in which she participated (the lineup) chose someone else as the alleged assailant. The court also concludes that the admission of identification evidence obtained through use of a clearly suggestive photographic array merely requires remand for reconsideration of the propriety of admitting such evidence. I cannot agree with either conclusion and, therefore, dissent.

1. *The composite picture.* The danger inherent in all identification evidence is well known and need not be fully restated. Suffice it to say that the United States Supreme Court has summed up the problem by stating that pretrial identification procedures arranged by the police are "peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial." *United States v. Wade,* 388 U.S. 218, 228 (1967). The danger inherent in these procedures is that unreliable or mistaken identifications may result. *Manson v. Brathwaite,* 432 U.S. 98, 114 (1977). We have been concerned with this danger and have insisted on an adequate showing of reliability. See *Commonwealth v. Venios,* 378 Mass. 24 (1979); *Commonwealth v. Botelho,* 369 Mass. 860, 865-868 (1976).

Of all the identification procedures devised, the least reliable is that which utilizes the so-called Identikit, as was done in this case. Again, there is no need to elaborate on the inherent suggestiveness of the Identikit procedure, as Justice O'Connor and I have set forth an extensive analysis of the problem in *Commonwealth v. Blaney,* 387 Mass. 628, 640, 642-643 (1982) (O'Connor, J., dissenting), and *Commonwealth v. Weichell,* 390 Mass. 62, 79, 81, 84 (1983) (Liacos, J., dissenting). The essential point remains that, although the court in *Weichell* did not accept those views fully, it did limit carefully the use of composite pictures to those resulting from the effort of a *single* eyewitness who was present in court to testify and

be cross-examined. The court stated: "The statements of the witness that form the basis for the composite drawing here would not be inadmissible under our more recent decisions since they are statements of an out-of-court identification ('his eyebrows, nose, and hair looked like that') by a witness *who has made an in-court identification and is available for cross-examination*. Since the statements of the witness that led to the creation of the composite are admissible, the composite which is prepared from the statements similarly ought to be admissible either because the composite retains the character of the statements that led to its creation or because the composite is not a statement within the meaning of the hearsay rule." (Emphasis added.) *Commonwealth* v. *Weichell, supra* at 72.

Here, the majority gloss over the unexplained absence of the composite witness Floyd and the loss of the right to examine her as to the reliability of the process. I doubt that the other composite witness's (McCarthy's) presence at trial would satisfy the majority as to the lack of confrontation of Floyd if McCarthy had been asked to relate — for purposes of identifying the defendant — whether Floyd had orally identified the defendant extrajudicially. Also, while we have recognized that the procedure of having witnesses choose jointly from a photographic array may not invalidate an identification, we have stated that it would be "highly preferable" for two witnesses to make their selections independently. *Commonwealth* v. *Moynihan*, 376 Mass. 468, 476 (1978) (describing resulting weakness in photographic identification as "close question"). *Id.* at 477. Clearly, the more suggestive Identikit procedure engaged in jointly by two witnesses and a police officer should present not only a "close question" but a clear answer: that a composite created by two witnesses interacting with the police officer should be inadmissible — *at least*, where one of the witnesses later misidentifies a person in a fair lineup and then is unavailable for trial examination.

2. *The photographic array.* The trial judge found that, in separate sessions, a photographic array of thirteen photographs was presented to the victim (Davis) and the composite witnesses, McCarthy and Floyd. All thirteen persons depicted were

white males. Only one, the defendant, was shown with eyeglasses. All three witnesses went for the eyeglasses. The witness McCarthy testified at trial:

DEFENSE COUNSEL: "Didn't you think that, at least, the wearing of the glasses was a distinctive feature?"

THE WITNESS: "I would notice somebody's glasses, sir, what kind they had, more than anybody else who doesn't wear glasses."

DEFENSE COUNSEL: "I see. Did you take particular notice of, and at least, was the one thing that stood out in your mind as distinctive the fact that the person that night had glasses on?"

THE WITNESS: "That was one of them."

DEFENSE COUNSEL: "In fact, mention was made underneath that composite that the person wears glasses; isn't that right?"

THE WITNESS: "Yes."

DEFENSE COUNSEL: "So that was something that you had in mind when you went to look at the pictures, didn't you?"

THE WITNESS: "Yes."

DEFENSE COUNSEL: "So you saw a group of pictures and you knew you were looking for someone with glasses, weren't you?"

THE WITNESS: "Yes."

DEFENSE COUNSEL: "And there is one in there with glasses, isn't there?"

THE WITNESS: "Yes."

McCarthy had testified similarly at the suppression hearing:

DEFENSE COUNSEL: "And that description indicated that the man wore glasses; is that right?

THE WITNESS: "Yes."

DEFENSE COUNSEL: "And that was something you remembered as fairly distinctive; isn't that correct?"

THE WITNESS: "Yes, because I, myself, also wear glasses."

The judge ruled: "1. I find and rule that there was no suggestiveness on the part of the police to the identifying witnesses in the preparation of the identi-kit sketch of the defendant on July 30, 1982, and that said sketch closely resembles the defendant, *even to the glasses*. 2. I find and rule that the photo

array, shown to the identifying witnesses on November 12, 1982, *was only suggestive in that the defendant had glasses on*. Otherwise, there was no suggestiveness." (Emphasis supplied.)

With all due respect, if the composite was supposedly reliable "even to the glasses," it is hard to fathom how "there was no suggestiveness" as to the array. To say that the array "was only suggestive in that the defendant had glasses on" strikes me as pure sophistry. *Commonwealth* v. *Mobley,* 369 Mass. 892, 896 (1976), does not help the Commonwealth because there the singular feature (ski cap) was stated by the identifying witness *not* to be the basis of the identification. Here, the witness admitted that he relied on the eyeglasses.

The court concludes there was "an element of suggestiveness in the photographic array." I agree with this understated position. Why then a remand? The photographic array was erroneously admitted; the evidence of the Identikit identification was also erroneously admitted. The errors were prejudicial.[1] The case should go back for a new trial. I dissent.

---

[1] In light of the position I take, I need not consider whether the lineup and courtroom identifications were so tainted as also to be inadmissible.