Fishman, Kenneth J., J.
The defendant, Michael Capuzzo, has been charged with armed assault with intent to murder and assault and battery with a dangerous weapon. He now moves to suppress identification evidence. After hearing, and upon review and consideration, the defendant’s motion to suppress is ALLOWED.
FINDINGS OF FACT
On December 31, 2012, Jacquan Kirby held a New Year’s Eve party at his parents’ home in Milton, Massachusetts. Between 10 to 30 Milton residents, all under the age of 21, attended this party. Many of the guests brought alcohol, and most of them consumed *318 it. A substantial number of the guests were partying in the basement of the home.
Later that night, a “party bus” containing the defendant and approximately 30 underage males and females, most of whom were from South Boston, arrived at the Kirby house. Kirby, who was admittedly drunk at the time the bus arrived, had allowed one of the passengers to bring a few friends to the party, but when a larger group arrived, he asked them to leave. The South Boston individuals did not leave, but rather many of them went into the basement where the parly was principally ongoing.
Kirby persisted in asking these individuals to leave, and ultimately a fight broke out with pushing and shoving and punches being thrown. Someone uttered the “N word” that may have been directed toward Kirby, who is African American. Up to 50 people were involved in the fight in the small basement area. Two of the Milton young men, Matthew Regan and Andrew Sheehan, were stabbed during the fight. Kirby did not see his friends get stabbed.
Regan, who had consumed anywhere from 12 to 14 beers, admittedly does not remember everything that occurred. He did not see a knife, and was unable to describe or identify the person who stabbed him. A few days after the fight, he saw the defendant’s photograph in the Patriot Ledger newspaper in a report of an arraignment in the Quincy District Court.[1] He told the police that he recognized the person in the photograph, the defendant Capuzzo, as being at the house that night. At least one individual told him that Capuzzo was the person that had stabbed him. Regan was not shown a photo array by the police.
Sean Peterson, who also admitted being drunk, indicated that he might be able to identify the person who was fighting with Kirby if he saw him. He described that individual as having black hair, being fairly short, 5’8" to 5T1," having a muscular stocky build, and weighing 160 to 180 lbs. He saw Matt Regan get stabbed from about 10 to 15 feet away, but was unable to say who stabbed him. He too saw an article in a newspaper with the photograph of Capuzzo, and testified that the person in the photo had similar hair and build as the person who stabbed Regan. He heard that person being identified as Capuzzo, and had heard people call him “Capuzzo” at the party. Peterson too was not shown a photo array by the police.
Andrew Sheehan was the other individual who was stabbed, but did not realize he was stabbed when it occurred. He said that he had seen a short, heavy set male 5’7" to 5’ 11" in height (but shorter than himself who was 5’11"), wearing a striped shirt, and holding a knife, standing in front of him. He said the individual had short hair like a crew cut, and he was 180 to 240 lbs. He remembers hearing the name “Capuzzo.” He heard the individual with the knife say “don’t come near me.” He did not see the press coverage concerning this case.
Nicholas Noonan, who was 20 years old, admitted to having 3 or more beers, but claimed not to be drunk at the time of the fight. He was personally involved in the fighting, and, at a point where he was up against a wall next to Sheehan, he was able to see Regan on the other side of the room get stabbed. He did not see Sheehan get stabbed.
Noonan was shown a photo array at the police station. The photo array had been prepared by Detective Kristen Clifford of the Milton Police, who was the lead detective on this investigation. Using the in-house computer system, she picked six filler photographs by comparing them to individuals she believed looked like Capuzzo. The Milton Police database’s photograph of Capuzzo showed him with a beard, and, therefore, all the fillers she selected also had beards. Specifically, she did not compile the array based on descriptions of the perpetrator provided by witnesses, but rather based on Capuzzo’s appearance. There are seven photos in the array, with the defendant’s photo being number four. They are of equal size with most of the subjects being of similar age,[2] and, all having similar haircut and facial hair. There is no substantial disparity in their builds or complexions. Only one of the photos (number 2) contains a subject who is smiling. Two photographs of the fillers (numbers 1 and 3) appear to be somewhat more faded than the others. The defendant’s photograph varies from the others to the extent that it is brighter by virtue of the lighting and has a brownish rather than grayish background. Detective Clifford noted that the photograph of the defendant fit the description provided of the perpetrator. She did not show an array to Regan because he had seen a photo of the defendant in the media.
Detective Pamela DiGiovanni showed Noonan the photo array at 8:30 p.m., on January 1,2012. She was asked to show the array to Noonan, although she possibly knew the defendant’s name and that there was a suspect prior to the showing of the array. She did not shuffle, nor was she asked to shuffle the array, and she did not review it for fairness. The form used by the Milton Police Department and signed by Noonan states:
You will be asked to look at a group of photographs. The fact that the photographs are shown to you should not influence your judgement [sic]. You should not conclude or guess that the photographs contain the picture of the person who committed the crime. You are not obliged to identify anyone. It is just as important to free innocent persons from suspicion as to identify guilty parties. Please do not discuss the case with other witnesses or indicate in any way that you have not identified someone.
The witness was initially shown the array one photo at a time, but then compared the photos side by side, looking at all of them together. The viewing took place in the library at the police station, and it was not video recorded. The witness narrowed the photographs *319 down to three, immediately discarding number 1, and focusing on number 4 (the defendant) and number 7. After 10 to 20 seconds, he selected number 7, and stated “that looks like the kid right there.” He was not asked his level of certainty, nor was he asked to do so. He assumed that he did not pick the right person, but he was clearly uncertain whether the police told him that or not. He had focused on the person whom he observed holding the knife and who was the stabber, and he had seen the stabber walk into the basement there earlier with other individuals from South Boston. He was not very confident in his selection between the two final photographs, but felt that he should pick one. He indicated to the police that he was not sure as between these two photographs, although the police failed to document this fact.
The same array was shown to Michael Rich. Rich, who was a 20-year-old from Milton, had consumed at least eight beers during the course of the night, but only admitted to being a “little drunk.” He had never met the defendant before, but did so that night, and saw him speaking with Kirby. He heard the defendant use the “N word,” and speaking in a raised voice. Kirby told him to leave. He was standing near Regan when he was stabbed, and observed the person who had been introduced to him as Mike Capuzzo doing the stabbing.
The photo array was conducted when the police came to his home. It was done in a cruiser, at 7:40 p.m., on January 1, 2012. When Police Officer Robert Ranton showed the array to Rich while they were seated in the back seat of the cruiser, Detectives Clifford and Lewis Bullard were in the front seat. Detective Bullard was one of the investigating officers as well. This was the first array that Officer Ranton had ever presented, and he was generally unaware of identification procedures, including the notion of a “double blind” procedure. He did not know anything about the defendant or any other suspect. Rich was presented with the same form as was presented to Noonan. Officer Ranton did not shuffle the order of the photographs and was not asked to do so. He did not have any conversation with Rich who, when viewing photo number 4, immediately said, ‘That’s him.” Similarly, he instantly said “not him” as to the other photographs. Officer Ranton did not observe what the detectives were doing in the front seat of the cruiser. Rich recalls that he told the police that he was 100% sure of his identification, but Officer Ranton did not remember eliciting that information. Detective Bullard asserts that he was facing forward during the photo array procedure and did not participate in it. He acknowledged that it would have been better if he and Detective Clifford were not in the vehicle so that there could be no inadvertent witness suggestion, and that he would not have been in the room if the procedure had been done at the police department. Rich maintains that while he spoke to his friend Regan after the array, he did not talk about the array itself, and that he did not speak with other friends about this case.
At the hearing of the instant motion, which took place on three separate days, this Court granted the defendant’s motion to permit the defendant to remain out of view of the identification witnesses.[3] The defendant was placed in a location where he could hear all the proceedings and testimony. The Commonwealth was advised by this Court that, if necessary, there would be a further hearing at which it could present additional evidence on any remaining issues.
CONCLUSIONS OF LAW
Under Article 12 of the Massachusetts Declaration of Rights, if a witness is subjected to a pre-trial photographic confrontation, that is “ ‘unnecessarily suggestive and thus offensive to due process’. . . then the prosecution is barred from using that particular confrontation in evidence at trial.” Commonwealth v. Johnson, 420 Mass. 458, 463 (1995), quoting Commonwealth v. Botelho, 369 Mass. 860, 866 (1976); Commonwealth v. Thornley, 400 Mass. 355, 363 (1987) (Thornely I). The rule of per se exclusion imposes on the defendant to demonstrate, by a preponderance of the evidence, that the confrontation was “ ‘so unnecessarily suggestive and conducive to misidentification’ as to deny the defendant due process.” Id. at 363, quoting Commonwealth v. Venios, 378 Mass. 24, 26-27 (1979); Johnson, 420 Mass, at 463. If the defendant sustains his or her burden, then the prosecution must establish by clear and convincing evidence, that any subsequent identification that it endeavors to introduce at trial was not the product of the impermissibly suggestive identification. Id. Under the Fifth Amendment to the United States Constitution, the due process inquiry is essentially the same. Simmons v. United States, 390 U.S. 377, 384 (1968).[4]
“In considering whether identification testimony should be suppressed, the judge must examine ‘the totality of the circumstances attending the confrontation to determine whether it was unnecessarily suggestive.’ ” Commonwealth v. Silva-Santiago, 453 Mass. 782, 795 (2009), quoting Commonwealth v. Odware, 429 Mass. 231, 235 (1999).
A photographic array is unduly suggestive if it is composed in such a manner that a defendant’s photograph is singled out from all others. Commonwealth v. Napolitano, 378 Mass. 599, 602-03 (1979). A photographic array is not impermissibly suggestive merely because the persons displayed in the array are not uniformly similar. Commonwealth v. Parker, 389 Mass. 27, 31 n.3 (1983). Although the photographs utilized in the two arrays presented to witnesses in this case have some variance in clarity and lighting, they are not so impermissibly suggestive to be offensive to due process. The subjects appearing in these photographs, including the defendant and the individuals portrayed in the six fillers, are of similar age (except *320 one), build, complexion, and hairstyle, and have facial hair. The array consisted of seven photographs, including the defendant’s. See Commonwealthv. Wellcer, 406 Mass. 590, 604 (2011) (must include at least five fillers). While the Supreme Judicial Court has specifically held that an array of photographs which distinguishes one suspect from all the others on the basis of some physical characteristic is discouraged; Silva-Santiago, 453 Mass. 795; see also Wells & Olson, Eyewitness Testimony 54 Ann. Rev. Psychol. 227, 287 (2003); here, there was no such distinguishing characteristic. Perhaps the most distinguishing quality of the photographs was the lighting of the photograph of the defendant as compared to two or three of the other photographs, but it was not so disparate as to give rise to a substantial risk of misidentification. Commonwealth v. Melvin, 399 Mass. 201, 205-07 (1987).
On July 25, 2013, the Supreme Judicial Court Study Group on Eyewitness Evidence (“Study Group”) issued its Report and Recommendation to the Justices (“Report”). This committee was created by the Supreme Judicial Court to determine how best to deter unnecessarily suggestive identification procedures. In so doing, the Court recognized that “eyewitness identification is not only the greatest source of wrongful convictions but also an invaluable law enforcement tool in obtaining accurate convictions,” and that “the research regarding eyewitness identification procedures is complex and evolving . . .” Walker, 460 Mass. at 604 n.16. In Walker, the Court acknowledged its decision in Commonwealth v. Jones, 423 Mass. 99, 108-09 (1996), in which it found that “[cjommon law principles of fairness dictate that an unreliable identification arising from the especially suggestive circumstances of this case should not be admitted in evidence even where the police were not responsible for the suggestive confrontation.” Walker, 460 Mass. at 605. The court went on to say:
We have not suggested, however, that in the absence of an unnecessarily suggestive police identification procedure by especially suggestive circumstances, a judge must serve as a gatekeeper of eyewitness identifications offered by the Commonwealth and admit only those identifications the judge finds to be reliable. Two years after we decided the Jones case, we rejected the argument that nonsuggestive pretrial identifications should be suppressed on the ground that they were unreliable, declaring, “(wjhen the procedures are not suggestive, the pretrial identifications are admissible without a further showing.” Commonwealth v. Payne, 426 Mass. 692, 694 n.3 (1998), quoting Commonwealth v. Warren, 403 Mass. 37, 39 (1998).
Walker, 460 Mass, at 605.
The Supreme Judicial Court, in Walker, convened the study group on eyewitness identification, to consider whether to adopt the approach taken by the Supreme Court of New Jersey in State v. Henderson, 208 N.J. 208 (2011). Walker, 460 Mass. at 606 n.16. The Walker court noted that in Henderson, the court held:
[Wjhere a defendant presents some evidence of suggestiveness that could lead to a mistaken eyewitness identification, the defendant is entitled to a pretrial hearing where the judge will consider all of the factors relevant to the reliability of the identification, including both “(s)ystem [v]ariables” (defined as “variables within the State’s control,” such as pretrial identification procedure, id. at 248) and “(e)stimated [v]ariables” (defined as “factors beyond the control of the criminal justice system” such as factors relating to the incident, the witness, or the perpetrator, id. at 261). The court declared, “(I]f after weighing the evidence presented, a court finds from the totality of the circumstances that the defendant has demonstrated a very substantial likelihood of irreparable misidentification, the court should suppress the evidence.” Id. at 289. The court noted that, under its previous framework, a defendant needed to prove the police procedures were “impermissibly suggestive” before a motion judge could consider estimator variables that bear on reliability. Id. at 286. Now, where the defendant has met the initial burden of showing some evidence of suggestiveness, a motion judge may consider all evidence relevant to reliability, including both system and estimator variables in determining whether the defendant has proved a very substantial likelihood of irreparable misidentification. Id. at 289. See State v. Hubbard, 48 P.3d 953, 963 (Utah, 2002) (“Even if law enforcement procedures are appropriate and do not violate due process, eyewitness identification testimony must still pass the gatekeeping function of the trial court and be subject to a preliminary determination — whether the jury identification is sufficiently reliable to be presented to the jury”).
Walker, 460 Mass, at 605-06.
The Supreme Judicial Court has yet to have occasion to announce whether it is implementing all or any part of the Study Group’s recommendations. As relates to this case, several aspects of the photographic eyewitness identification procedure run afoul of the recommendations. Specifically, the Report contains a recommendation regarding the best practices for Massachusetts police departments, and, as to those that relate to photo arrays, the following practices are included:
1. When assembling a photo array, officers should ensure they are using a current and accurate photograph of the suspect. In the case of arrays and lineups, they should select fillers based on their similarity to the witness’s description of the offender, not to the appearance of the suspect. However, officers must also ensure that nothing about the suspect or his photo makes him stand out.
*321 3. When showing a photo array or conducting a lineup, the police must use a technique that will ensure that no investigator present will know when the witness is viewing the suspect. The preference is that the police have an officer who does not know who the suspect is administer the array or lineup. With photo arrays, they may use a blinded technique such as the folder shuffle as alternative.
***
6. When an eyewitness identifies a photograph or person, the officer must immediately asked the witness how certain or confident he is of the identification.
7. When an officer is showing a photographic array or lineup to a subsequent witness in the same investigation, the officer should shuffle the order so as to ensure that there could be no collusion between the two witnesses.
9. Whenever practicable, the police should videotape or audiotape a photo array or lineup.
Here, with respect to the photo array shown to Noonan, the array was prepared by Detective Clifford, using for selection of the fillers, photos of individuals she believed that looked like Capuzzo, rather than based on the descriptions provided by various witnesses. The photo array shown to Noonan was conducted by a detective, Pamela DiGiovanni, who knew that there was a suspect prior to the showing of the array and possibly was aware of the defendant’s name. That photo array was shown to Noonan approximately 50 minutes after a photo array had been presented to Rich. It had not been shuffled in the interim. Noonan was not asked how certain he was after he selected number 7, who was not the defendant. Noonan had focused on the defendant’s photograph as well, and had told the police that he was not sure as between photographs 4 and 7, who was the perpetrator. Detective DiGiovanni’s documentation of the photographic array was entirely inadequate, and certainly was not audiotaped or videotaped.
The same photographic array had been presented earlier to Rich by a police officer who was unfamiliar with the defendant or any aspect of this investigation. However, it was done in a police cruiser, in which two detectives, Clifford and Bullard, who were both actively involved in the investigation, were present in the front seat. This situation created a risk of so-called “situational clues” being transmitted to the witness.
This Court is concerned that there was admitted contact between various witnesses during the investigation process, although there was no evidence specifically that Rich, or anyone with whom he spoke, advised Noonan about any specific aspect of the photographic array, including the person whom Rich had selected. Rich did advise the police that he was 100% sure of his identification but oddly the Police Officer Ranton did not remember obtaining that information nor did he record same in any fashion.
Any one of these deviations from the so-called best police practices, standing alone, would likely not warrant exclusions of the photographic identifications. Here, however, the cumulative nature of the deviations, particularly when considered in connection with the indicia of unreliability flowing from system and estimated variables, discussed below, would warrant exclusion of the eyewitness identifications by both Noonan and Rich if the Report’s recommendations were to be followed.
Specifically, neither of these arrays were truly blind arrays, and the potential for even inadvertent or unintentional signals to the witness was present given the participation, or at least presence of officers aware of whom the suspect was. This inappropriate situation was exacerbated by the fact that there was communication between these young men from Milton, including a potential discussion between Rich and Noonan regarding their experiences with the arrays. The fact that Noonan ultimately selected number 7 rather than number 4, does not resolve the issue. Indeed, if not excluded, the witness would be able to testify that he was uncertain as between the defendant’s photograph and the one he chose but that he believed that the defendant was potentially the perpetrator.
If there was communication between the witnesses, it was not cured by any shuffling of the array between the two photo array procedures. Although the array itself was not unduly suggestive, the disparity in lighting between the defendant’s photograph and the majority of the fillers would be a matter the witnesses could have conveyed to each other as well.
The deviations from the best practices are of particular concern here. The kind of problems that result from the absence of adequate documentation or recordation of the processes, are present here, including the fact that although Rich claims to have advised Officer Ranton of his level of certainty, Officer Ranton has no recollection or recordation of eliciting that information.
Police breaches of the best practices in connection with identification procedures when considered in connection with certain factors relating to the incident and the witnesses, now referred to as estimated variables, substantially enhanced the probability that the identification was so unreliable as to warrant exclusion. The stabbings occurred in a small basement area in which up to 50 people were involved in a fight. The witnesses had all been consuming a substantial amount of beer, including most notably Rich, who, while stating that he was “a little drunk,” admitted to having drunk at least eight beers. Balanced against those concerns are the fact that the two witnesses were able to observe the stabbings at a relatively close proximity, and in Rich’s case, he had earlier in the evening been introduced to the defendant. Nevertheless, *322 particularly given certain inconsistencies in Rich’s description of the events, these identifications cannot be considered reliable.[5] The identifications produced by these photograph array procedures must be excluded.
Whether applying the Report’s recommended burden of establishing by a preponderance of the evidence that the eyewitness identification was unreliable or that specific police practices were not followed in a substantial way, or by applying the traditional burden of the Commonwealth to establish by clear and convincing evidence that any subsequent identification are not the product of suggestive identification but rather are founded on a source independent of the initial investigation, see, e.g., Commonwealth v. Colon-Cruz, 408 Mass. 533, 541-42 (1990), the result should be the same.
The issue remains whether two other witnesses, Kirby and Peterson, who saw the defendant’s photograph in newspapers, as well as references to the defendant’s name in the article, and who have heard other individuals identify the defendant as the stabber, should be permitted to make in-court identifications of the defendant. In Jones, the Court suppressed an identification when the witness observed the defendant shackled to a co-defendant in the courtroom and circumstances which indicated that the prosecution thought the defendant had been involved in the crimes. The Court held:
Eyewitness identification of a person whom the witness had never seen before the crime or other incident presents a substantial risk of misidentification and increases the chance of a conviction of an innocent defendant. In Commonwealth v. Johnson, supra, we noted that, “the vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification.” Id, at 466 quoting United States v. Wade, 388 U.S. 218, 228 (1967), and citing numerous authorities. Id. at 467-68 n.9. The Supreme Court has de-emphasized the role of deterring police misconduct in the analysis of suggestive confrontations to focus more on nonreliabilify as the justification for the exclusion of an identification that may have been influenced by a suggestive confrontation. See Neil v. Biggers, 409 U.S. 188, 198 (1972) (“[i]t is the likelihood of misidentification which violates a defendant’s right to due process, and it is this which was the basis for the exclusion of evidence”); Manson v. Brathwaite, 432 U.S. 98, 111-12 (1977).
We need not base our decision on constitutional grounds. Common law principles of fairness dictate that an unreliable identification arising from the especially suggestive circumstances of this case should not be admitted. This encounter was not a casual confrontation in neutral surroundings, such as occur through the media. See, e.g., Commonwealth v. Colon-Cruz, 408 Mass. 533, 542 (1990).
423 Mass, at 109-10. Thus, although the viewing of the defendant’s photograph in media coverage of his arraignment by Kirby and Gunderson may not, in and of itself, require exclusion of their identifications of the defendant under common law principles of fairness, the potential for an unreliable identification is so greatly enhanced by the suggestions of others to these witnesses that the defendant was the one who committed the stabbings, that their in-court identifications must be excluded.
The responsibility of this Court must be to exclude eyewitness identifications which present a substantial risk of misidentification that enhance the chance of the conviction of an innocent defendant. Jones, 423 Mass, at 109. Whether based on the Study Group’s recommendations, yet to be approved by the Supreme Judicial Court, of due process, or common-law principles of fairness, it is clear to this Court that under circumstances here, the risks of misidentification are far too high to tolerate the presentation of this identification evidence to a jury.[6]
Accordingly, all of the proffered identification evidence must be suppressed.
ORDER
Based on the foregoing, it is hereby ORDERED that the Defendant’s Motion to Suppress Identification is ALLOWED.

The photograph in the Patriot Ledger on January 3, 2012, shows only part of the defendant’s face as he was attempting to shield himself from the camera. A posting appeared on Wickedlocal.com, on January 2, 2012, described the incident and included the booking photograph of the defendant.

One subject (number 7) was approximately eight years older than the defendant, while the others were within three years of the defendant. Number 7, however, does not appear that many years older.

A similar motion was denied by the District Court Judge during arraignment, and, as a result, a photographer was able to photograph the defendant.

Under federal law, however, once the identification process is deemed unnecessarily suggestive, it is not excluded unless the identification is also determined to be unreliable. Neil v. Biggers, 409 U.S. 188 (1972); Manson v. Brathwaite, 432 U.S. 98 (1977).

These inconsistencies include, for example, that it was only at the suppression hearing where Rich first claimed to have seen the defendant stab two people; he claimed to have never talked to any of his friends after the identification which was inconsistent with the testimony of others (Noonan, Regan and Peterson testified that they had talked to Rich about the defendant); and his testimony that Regan was either laying down or sitting up while stabbed as opposed to the accounts of others who saw Regan involved in the fight at the time he was stabbed.

It is not necessary to hold further hearings to determine whether, pursuant to Botelho, the in-court identifications would be Independent of any taint from unreliable pretrial identification procedures. 369 Mass, at 865-69. The record here was thorough with regard to this Court’s determination that the identifications were unreliable and, therefore, they must be excluded. Moreover, the record reveals that a substantial risk exists that any in-court identification would be the product of the phenomena of conscious transference (based on the media photographs), see Report, at p.100, comment H, and/or impacted by discussions among the Milton youths.